**EASTERN AMERICA TRIO PRODUCTS, INC.,**
Plaintiff,

v.

**TANG ELECTRONIC CORPORATION, Digital Import, and China Ching Kong Technology Corporation, Defendants.**

No. 98 Civ. 8286(LAK).

United States District Court,
S.D. New York.

May 3, 2000.

Andrew S. Langsam, Morris E. Cohen, Marilyn Neiman, Levisohn, Lerner, Berger & Langsam, New York City, for plaintiff.

Joseph J. Zito, Damascus, MD, Donald E. Creadore, Jr., Tunick, Kupferman, & Creadore, P.C., New York City, for defendants.

### OPINION

KAPLAN, District Judge.

Plaintiff Eastern America Trio Products, Inc. ("Eastern") here sues two of its competitors for design patent, trade dress, and copyright infringement, as well as unfair competition. trademark dilution, and deceptive business practices. Eastern alleges that Tang Electronic Corporation ("Tang") and Digital Import[1] are infringing its table top pay telephone design, imitating its packaging and product configuration, and that Tang is using plaintiff's own photos in its sales catalogs. Defendants deny all claims against them and counterclaim for unfair competition.

Tang moved for summary judgment on the design patent infringement claim[2] on the ground that plaintiff's patent is invalid for failure to disclose known prior art to the United States Patent and Trademark Office ("Patent Office"). Plaintiff opposed the motion, and all parties agreed to a bench trial on a stipulated record consisting of sworn statements, exhibits, and other evidence. These are the Court's findings of facts and conclusions of law based on that stipulated record.

### I.

#### Design Patent Infringement

Eastern is a New York corporation owned by Jimmy and Judy Chien. It sells table top pay telephones, related telecommunications products, and other electrical products, at least in part through the use of sales catalogs.[3] Eastern purchases its telephones from Holythai Industry Co., Inc. ("Holythai") which is located in Bangkok, Thailand, and run by Wan–Neng Chuang.

---

1. Plaintiff describes Tang and Digital Import as "closely related entities or the same entity." Plaintiff asserts that they have identical places of business and, to the best knowledge of plaintiff, the same employees. PX 50 (Judy Chien) ¶ 5. In the absence of definitive evidence either way, the Court treats their interests as identical except as to the claims of copyright infringement which plaintiff asserts only against Tang.

The third defendant, China Ching Kong Technology Corporation ("CCKT"), never was served in this action. Joint Pretrial Order ("PTO"), Stipulated Facts ¶ 5. Unless otherwise noted, all references to the PTO will refer to Section III, Stipulated Facts.

2. Defendants requested that the Court dismiss the complaint with prejudice, but alleged facts relating to and briefed only the design patent issue. Def. Tang's Rule 56.1 Statement of Material Facts on Motion for Summary Judgment ("Tang's 56.1 St."); Def. Tang's Mem. in Support of Motion for Summary Judgment ("Tang Mem.").

3. PX 49 (Jimmy Chien) ¶ 7; PTO ¶ 19.

Like Eastern, the defendants are New York based businesses that sell table top pay telephones, related telecommunications products, and other electrical products through sales catalogs. Tang purchases its telephones from CCKT, a Hong Kong company that is owned by Tung–Wen Chuang, who is either Wan–Neng's brother or nephew.[4]

Eastern and Tang sell competing telephones. Eastern's current model is said to have been invented by the Chiens and Wan–Neng Chuang of Holythai. It is manufactured for Eastern by Holythai and sold here under the designation SN–6806. Its design is protected by United States Patent No. 396,465 (the " '465 patent"), which was issued on July 28, 1998 and assigned to Eastern. Tang's current model, the accused device in this case, is manufactured for it by CCKT and sold under the designation CKT–686. Its design is protected by U.S. Patent No. 408,034 (the " '034 Patent"). Plaintiff here claims that the CKT–686 infringes the '465 patent. Tang, for its part, contends that the SN–6806 is nothing more than a modification of a design previously sold by CCKT and, in any case, that the '465 patent is unenforceable because the inventors failed to disclose to the Patent Office prior art that would have prevented the issuance of the patent.

## A. The Origins of the SN–6806 and the CKT–686

The parties fundamentally disagree about the origins of the two designs at issue. According to defendants, the SN–6806 is merely a modified version of the CKT–679, a table top telephone that CCKT has been selling since at least 1995.[5] Defendants contend that CCKT sold the CKT–679, unassembled, to Holythai which assembled and resold it in Thailand as the HT–900.[6] Holythai subsequently modified the HT–900 to create the HT–910, which Eastern sells as the SN–6806 in the United States.[7] In response to the unsanctioned use of its technology, CCKT severed business ties with Holythai in 1997.[8] Then, in early 1998, CCKT modified the appearance of the CKT–679 to create the CKT–686,[9] for which it obtained the '034 patent on April 13, 1999.[10] It is this patented model that Tang purchases from CCKT for sale in the United States.[11]

Plaintiff tells a different story. According to plaintiff, the SN–6806 is "an entirely new [phone] design" created by Jimmy and Judy Chien and Wan–Neng Chuang.[12] Because the SN–6806 replaced the HT–900 as Holythai's latest model, it is sold in Thailand as the HT–910.[13] Plaintiff claims that the CKT–679 did not exist prior to commencement of this litigation, that plaintiff certainly was not aware of its existence,[14] and that it now believes that

4. *Compare* Tang's 56.1 St. 1 (claiming the two are brothers) *with* Pl. Mem. in Opposition to Motion for Summary Judgment ("Pl.Mem.") 21 (asserting Tung–Wen Chuang is Wan–Neng's nephew).

5. Tang Mem. 2.

6. Tang's 56.1 St. 1–2. Defendants have not included dates that correspond to these events in any of their papers.

7. *Id.* at 2. The Court will refer to the HT–910/SN–6806 exclusively as the SN–6806 throughout this opinion.

8. *Id.*

9. *Id.*

10. PX 41.

11. Tang's 56.1 St. 2; PTO ¶ 16.

12. Pl. Mem. 12.

13. PTO ¶ 14.

14. Pl. Mem. 1, 4–5, 10; *see also* July Chien Cert. ¶¶ 12–15; Jimmy Chien Cert. ¶¶ 11–14; Wan–Neng Chuang Cert. ¶¶ 28–31; Harap Cert. ¶¶ 6–11.

   Defendants assert that the existence of the CKT–679 prior to commencement of this suit is established by a Chinese newspaper advertisement for CCKT's attendance at the Taipei International Electronics Show from October 12–17, 1996, which is said to depict the CKT–679. Tang Mot. for Summary

the CKT–679 is the result of CCKT copying Holythai's HT–900.[15] This is possible, plaintiff explains, because Wan–Neng Chuang mailed the HT–900 to Tung–Wen Chuang in September 1996, after CCKT expressed an interest in purchasing the HT–900 from Holythai.[16] Although CCKT ultimately did not purchase the HT–900 from Holythai, plaintiff believes that CCKT took advantage of the opportunity to copy Holythai's design.[17]

The principal evidence bearing on this *contretemps*, apart from the parties' self-serving declarations, is a document submitted by defendants that purports to be a photocopy of an August 8, 1997 invoice reflecting the sale by CCKT to Holythai of spare parts for a model number 535–679, which defendants assert is the CKT–679.[18] If genuine, the invoice would lend support to defendants' assertion that CCKT sold the CKT–679 and its parts to Holythai which, in turn, would substantiate defendants' version of events. Plaintiff, however, claims that the invoice is fabricated and that CCKT never sold the CKT–679 or parts for the CKT–679 to Holythai.[19] Plaintiff accuses defendants of altering the invoice for purposes of this lawsuit, and submits an original carbon copy of the invoice as support for its position.[20]

The versions of the invoices submitted by the parties are identical in all material respects save that whereas both refer to a model number 535 in the Description of Goods column, the characters "–679" appear after that number on defendants' version alone. The number "679" on defendants' version is in a glaringly different typeface than that used for the balance of the invoice. Defendants have offered no credible explanation for the addition of those numbers. Moreover, there is no evidence that any model number 535–679 ever existed. While Holythai did have a model number HT–535,[21] a comparison of that instrument with CCKT's CKT–679 reveals that their body shapes are so different that many of the items listed on the invoice could not possibly be interchangeable components of both models, particularly the body case, or housing.[22] Accordingly, the Court finds that defendants altered the invoice by adding the number "679" in an effort to mislead the Court into believing that CCKT sold the CKT–679 or components thereof to Holythai.

Spoliation of evidence like this undermines a litigant's entire case because it gives rise to inferences that the litigant believes that it cannot prevail by fair means and, in any case, is not to be trusted.[23] In all the circumstances, the Court finds that the SN–6806 was created by the Chiens and Wan–Neng Cheng and not copied by them from the CKT–679. Indeed, the Court finds that they were not aware of that design when the SN–6806 was created.

### B. Enforceability of the '465 Patent

Defendants argue that plaintiff's patent is unenforceable because the inventors failed to disclose the CKT–679 and the

Judgment, Ex. 4. Even assuming that the image in the advertisement is of the CKT–679, which is not entirely clear, the fact remains that there is no credible evidence plaintiff knew of the CKT–679's existence before this action began nor that Holythai purchased that model from CCKT and sold it as the HT–900.

**15.** Pl. Mem. 12.

**16.** *Id.* at 8.

**17.** *Id.* at 8, 12.

**18.** Tang Decl. ¶ 6 and Ex. 5.

**19.** Pl. Mem. 5.

**20.** PX 19; *see also* Wan–Neng Chuang Cert. ¶¶ 15–16 and Ex. A (copy of invoice).

**21.** PX 53.

**22.** *See* Pl. Mem. 7; Wan–Neng Chuang Cert. ¶¶ 20–21.

**23.** *See, e.g., Reilly v. Natwest Markets Group Inc.,* 181 F.3d 253, 267–68 (2d Cir.1999); *Bouzo v. Citibank, N.A.,* 96 F.3d 51, 60 (2d Cir.1996).

HT–900 as relevant prior art in their patent application.[24]

■ A party seeking a patent has an affirmative duty to disclose to the Patent Office all information known to that individual to be material to patentability,[25] including prior art that may be so similar as to make the new design unoriginal. Where an applicant has breached this duty, intentionally or through bad faith, no patent will be granted.[26] If the patent already has been granted, failure to disclose material information may result in the patent being declared unenforceable.[27] Once a patent is issued, however, it is presumed valid and enforceable unless the challenging party proves otherwise.[28]

■ In order to render plaintiff's patent unenforceable, defendants must prove by clear and convincing evidence[29] that the applicants for the '465 patent engaged in inequitable conduct.[30] Inequitable conduct based on nondisclosure of prior art requires that: (1) the prior art be material; (2) the patent applicant knew of the prior art and its materiality; and (3) the nondisclosure resulted from an intent to mislead the Patent Office.[31]

Defendants claim that the applicants knew of the HT–900 and the CKT–679, that these models constitute material prior art, and that they intentionally misled the Patent Office by failing to disclose these designs, thereby making the '465 patent unenforceable. As stated previously, plaintiff contends that the inventors of the '465 design never saw the CKT–679, and that CCKT did not advertise or sell the CKT–679, until after this litigation was commenced.[32] The inventors acknowledge that they knew of the HT–900, but deny that its design was material to their patent application.[33] Furthermore, plaintiff claims that neither the CKT–679 nor the HT–900 was material prior art because the

---

24. The Court here notes the difference between a claim of unenforceability of a patent and one of invalidity. Invalidity results when published prior art either anticipates a claim in a patent or renders the claim obvious to a person of ordinary skill in the art, *see* 35 U.S.C. §§ 102 and 103, while unenforceability is a consequence of inequitable conduct, sometimes referred to as unclean hands, which involves an inquiry into whether the patent applicant made affirmative misrepresentations of material fact or failed to disclose material information to the Patent Office with an intent to deceive. *See HCC, Inc. v. R H & M Machine Co.*, 39 F.Supp.2d 317, 322–23 (S.D.N.Y.1999).

25. 37 C.F.R. § 1.56(a) (1999).

26. *Id.*

27. *See Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1070 (Fed.Cir.), *cert. denied*, 525 U.S. 876, 119 S.Ct. 178, 142 L.Ed.2d 145 (1998); *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1256 (Fed.Cir.1997), *cert. denied*, 523 U.S. 1071, 118 S.Ct. 1510, 140 L.Ed.2d 665 (1998).

28. 35 U.S.C. § 282.

29. *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1181 (Fed.Cir.1995).

30. Different courts alternately use the terms inequitable conduct and fraud to describe the act of intentionally failing to disclose material information to the Patent Office. *See, e.g., Symbol Technologies, Inc. v. Opticon, Inc.*, No. 86 Civ. 8736(KMW), 1990 WL 58887, *4 (S.D.N.Y. May 3, 1990) ("Fraud, or 'inequitable conduct,' as it is referred to by the Federal Circuit, vitiates a patent when a patent applicant, with an intent to deceive, either fails to disclose to the PTO material information or submits to the PTO false material information."). *Compare Elk Corp. v. GAF Building Materials Corp.*, 168 F.3d 28, 30 (Fed.Cir.), *cert. denied*, —— U.S. ——, 120 S.Ct. 178, 145 L.Ed.2d 150 (1999) (inequitable conduct) *with Pentech Int'l, Inc. v. Hayduchok*, 18 U.S.P.Q.2d 1337, 1345–46 (S.D.N.Y.1990) (fraud). *But see Norton v. Curtiss*, 57 C.C.P.A. 1384, 433 F.2d 779, 793 (1970) (inequitable conduct is that which "fail[s], for one reason or another, to satisfy all the elements of the technical offense [of fraud]").

31. *See Elk Corp.*, 168 F.3d at 30 (citing *Molins*, 48 F.3d at 1178).

32. *See supra* note 14 and accompanying text.

33. Pl. Mem. 2.

elements common to those designs and the '465 design are found in prior art that was disclosed to the Patent Office.[34]

In this case the question of whether or not the Chiens and Wan–Neng Chuang knew about the CKT–679 at the time they filed their patent application is rendered immaterial by their admission that they knew of the HT–900 which, according to the parties, is the evolutionary equivalent of the CKT–679. Plaintiff admits that the inventors of the '465 design had knowledge of the HT–900 throughout the pendency of their patent application.[35] The issue, then, is whether the HT–900 was material to the '465 patent application and, if so, whether the applicants knew of its materiality and intentionally failed to disclose in an effort to mislead the Patent Office.

### 1. Materiality of the HT–900

Prior to 1992, information was defined as material if "there [was] a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent."[36] Current regulations define material information as that which is "not cumulative to information already of record" in the application and that (1) "establishes, by itself or in combination with other information, a prima facie case of unpatentability," or (2) "refutes, or is inconsistent with, a position the applicant takes in: (i)[o]pposing an argument of unpatentability ... or (ii)[a]sserting an argument of patentability."[37]

■ In order for defendants to sustain their burden under this new definition of materiality, they must show that the existence of the HT–900 made the '465 design *prima facie* unpatentable[38] or refuted the applicants' position that the '465 design was patentable.

An item is unpatentable when, among other things, "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."[39] In other words, the '465 design would have been unpatentable if, at the time it was designed, a person skilled in the art of designing phones would have thought it obvious in light of already existing phones. In addition, a design is patentable only if it is "new, original and ornamental."[40] Thus, the HT–900 was material if it rendered the '465 design obvious or unoriginal.

As noted by defendants, the '465 design has the same basic shape and placement of elements as the HT–900.[41] While there are distinct differences between the phones, their basic designs are similar. These similarities alone are not, however, sufficient to render the '465 design obvious or unpatentable.

■ The ultimate determination of whether an invention is non-obvious is a legal conclusion based on underlying factual inquiries that include: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) objective evidence of

---

34. *Id.* at 13–16. *See also* Jimmy Chien Cert. ¶¶ 21–22; Judy Chien Cert. ¶¶ 23–24; Wan–Neng Chuang Cert. ¶¶ 40–41.

35. Pl. Mem. 2.

36. 37 C.F.R. § 1.56(a) (1984).

37. 37 C.F.R. § 1.56(b) (1999).

38. The regulations state that "[a] prima facie case of unpatentability is established when the information compels a conclusion that a claim is unpatentable under the preponderance of evidence ... standard, ... before any consideration is given to evidence which may ... establish a contrary conclusion...." *Id.*

39. 35 U.S.C. § 103(a).

40. 35 U.S.C. § 171.

41. Tang Mem. 8; *see also* PX 1, 4.

non-obviousness.[42] The Court has examined each of the eight telephones cited as prior art in plaintiff's application [43] and concludes that the '465 design would not have been obvious to persons skilled in the art of telephone design, and its non-obvious features were new, original, and ornamental.

Defendants argue that the differences between the '465 design and prior art, particularly the uncited HT–900, are minimal and point to five design elements found and located in the same position on both the HT–900 and the '465 design: the push buttons keys, coin slot, LCD display, instructions for use, and talk button.[44] Plaintiff avers that each of the above elements was known in the prior art and enumerates 13 design differences between the HT–900 and the '465 design.[45]

■ There are substantial ornamental differences between plaintiff's design and the prior art, including the HT–900. Notably, the '465 design has a whole-body curved shape, an inset gray faceplate with a curved design, oval recesses for the talk button and coin slot, and transparent number keys.[46] These elements combine to make the design, as a whole, non-obvious.[47]

Defendants have submitted very little evidence to the contrary.[48] In the absence of such evidence, the Court cannot determine that the existence of the HT–900 rendered the SN–6806 *prima facie* unpatentable, or that it would have been inconsistent with a position that the inventors took in asserting an argument of patentability. This conclusion is bolstered by the fact that Tung–Wen Chuang disclosed the '465 design as prior art in his application for a design patent for the CKT–686 and, despite their apparent similarity, received a patent.[49] In consequence, the Court concludes that the HT–900 was not material to patentability under the definitions set forth in the current version of 37 C.F.R. § 1.56(b). Accordingly, the inven-

**42.** *See WMS Gaming Inc. v. International Game Technology,* 184 F.3d 1339, 1355 (Fed. Cir.1999).

**43.** *See* PX 40; Tang's Mot. for Summary Judgment, Ex. G.

**44.** Tang Mem. 9.

**45.** Pl. Mem. 13–19.

**46.** *Compare* PX 1 *with* PX 4 and 40.

**47.** Commercial success also may be material on the issue of obviousness. *See WMS Gaming Inc.,* 184 F.3d at 1359; *see also Litton Sys., Inc. v. Whirlpool Corp.,* 728 F.2d 1423, 1443 (Fed.Cir.1984), *overruled in part on other grounds by Two Pesos Inc. v. Taco Cabana,* 505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) ("To be of value, evidence of commercial success must clearly establish that the commercial success is attributable to the design, and not to some other factor, such as a better recognized brand name or improved function"). Sales of the SN–6806, the embodiment of the '465 design, were higher than sales of the HT–900 telephone in both 1998 and 1999. Wan–Neng Chuang Cert. ¶ 45. Because the sales figures were given by Wan–Neng Chuang, who invented and sold both the HT–900 and the SN–6806 through his business, it is unlikely that brand name was a factor in the commercial success of the SN–6806 and there has been no suggestion that the HT–900 and the SN–6806 have different functions. The significance of this evidence is diminished, however, by the fact that the SN–6806 was marketed by Eastern in the United States whereas the HT–900 was not. Pl. Mem. 12. In consequence, the Court does not rely on commercial success in finding the '465 design non-obvious.

**48.** Defendants submitted a composite of the prior art cited in the '465 patent application. Def. Tang Mot. for Summary Judgment, Ex.G. They state that the patent examiner found each of the cited references important in the examination process and, because the HT–900 is closer in design to the SN–6806, assert that a reasonable patent examiner would have considered the HT–900 important. Tang Mem. 9. Defendants rely, however, on the wrong test for materiality. In their memorandum of law, defendants cite the old test for materiality rather than the test contained in the current patent regulations. Defendants may have shown a substantial likelihood that a reasonable examiner would have considered the HT–900 important in deciding patentability, but they have not shown that the HT–900 is material under revised Section 1.56.

**49.** *See* PX 41 (the '034 patent).

tors had no duty to disclose it to the Patent Office, and did not render their patent unenforceable by failing to do so.

### 2. Intent to Mislead the Patent Office

■ Even if the design of the HT–900 was prior art that should have been disclosed, defendants have not met their burden of proving intent to mislead the Patent Office.

"Direct evidence of intent or proof of deliberate scheming is rarely available in instances of inequitable conduct ... [and] intent may be inferred from the surrounding circumstances." [50] The evidence must indicate more than "gross negligence," however, and must show that the applicant made a "deliberate decision to withhold a known material reference." [51] While the inventors knew of the HT–900, they repeatedly assert that they did not believe it to be material to their patent application. [52] Given the Court's previous analysis, and the complete lack of evidence to the contrary, [53] the Court accepts these assertions. Thus, while the inventors of the '465 design may have breached some duty of candor by failing to disclose the HT–900 to the Patent Office, their behavior did not rise to the level of inequitable conduct sufficient to justify holding the '465 patent unenforceable.

### C. Did Defendants Infringe the '465 Patent?

■ The test for infringement of a design patent first was set forth by the Supreme Court in 1872, in *Gorham Co. v. White*, [54] which held "that if, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other." [55] This standard has been changed in the ensuing 128 years only to add a second inquiry into whether the accused device appropriates the novelty of the patented device that distinguishes it from the prior art. [56] This "point of novelty" test does not require that the infringing item appropriate every point of novelty of the patented design. Rather, a finding of infringement requires only that the similarities between the two items be attributable to the novelty which distinguishes the patented device from the prior art. [57]

### 1. Substantial Similarity

The *Gorham* test for substantial similarity requires the Court to look at the patented and accused designs in their entireties to determine whether the ordinary observer would be likely to purchase one thinking it was the other. [58] The patented design, however, is measured by the patent claims, and therefore requires the Court to compare the accused phone to the design patent rather than its physical embodiment, an actual SN–6806 phone. [59] Al-

**50.** *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1256 (Fed.Cir. 1997).

**51.** *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1181 (Fed.Cir.1995).

**52.** Jimmy Chien Cert. ¶ 23; Judy Chien Cert. ¶ 25; Wan–Neng Chuang Cert. ¶ 42.

**53.** *See, e.g., Braun Inc. v. Dynamics Corp. of Am.*, 975 F.2d 815, 822 (Fed.Cir.1992) (failure of defendant to present testimony of anyone with knowledge of prosecution of design patent resulted in "dearth of evidence" on the issue of intent and thus did not meet clear and convincing evidentiary standard).

**54.** 14 Wall. 511, 81 U.S. 511, 20 L.Ed. 731 (1871).

**55.** *Id.* 81 U.S. at 528.

**56.** *See Litton Sys.*, 728 F.2d at 1444.

**57.** *Id.*

**58.** *See, e.g., Lee v. Dayton–Hudson Corp.*, 838 F.2d 1186, 1190 (Fed.Cir.1988).

**59.** *See Rockport Co. v. Deer Stags, Inc.*, 65 F.Supp.2d 189, 193 (S.D.N.Y.1999) ("The test for infringement does not compare the commercial embodiments of the two products.

though the Federal Circuit has held that where "no distinction in design has been shown between the patent drawing and its physical embodiment, it is not error for the court to view them both," [60] it is "legal error to base an infringement finding on features of the commercial embodiment not claimed in the patent." [61] In other words, Eastern's patent protects only those elements explicitly claimed in the patent. As an initial matter, therefore, the Court must determine the scope of Eastern's patent claim.

■ Design patents are narrow in scope and are limited to what is shown in the application drawings.[62] Eastern's patent contains the following frontal-view drawing of its design:

This illustration shows the curved body, the inset faceplate with an overlaid curved design dipping down on the right side to encompass the LCD display, a rectangular space to the left of the keypad (for instructions), oval recesses for the talk button and coin slot, and rounded number keys. No color schemes or dimensions are indicated.

■ A design patent protects only the novel and ornamental features of the patented design, and so the Court must also consider prior art [63] and functionality in determining the scope of a patent.[64] The curved body, the location of the coin slot in the top right side of the phone, and the location of the coin return in the center of the base are each seen in U.S. Patent No. 297,638. Rounded number keys are seen in U.S. Patent No. 324,519.[65] The relative locations of the coin slot, talk button, coin return, LCD display, number buttons, and instructions for using the phone are found on the HT–900.[66] Additionally, the inclusion of each of these elements serves a functional purpose. Thus, the fact that the CKT–686 has a curved body and possesses

Rather, the allegedly infringing product is compared only to the patented design.") (citing *Sun Hill Indus., Inc. v. Easter Unlimited, Inc.*, 48 F.3d 1193, 1196 (Fed.Cir.1995)).

**60.** *Dayton–Hudson Corp.*, 838 F.2d at 1189.

**61.** *Sun Hill Indus., Inc. v. Easter Unlimited, Inc.* 48 F.3d 1193, 1196 (Fed.Cir.1995).

**62.** *See Rockport Co.*, 65 F.Supp.2d at 192. The description of the patented design con-

sists solely of black and white drawings. *See* PX 1.

**63.** *See Litton Sys., Inc.*, 728 F.2d at 1444.

**64.** *Rockport Co.*, 65 F.Supp.2d at 193.

**65.** PX 40.

**66.** *See* PX 4.

many of the same features as the '465 design positioned in a relatively similar configuration does not necessarily indicate infringement because these are not protectible elements of Eastern's patent.

■ Taking the narrow scope of the patented design into consideration, and comparing it to the CKT–686, the Court finds that the two phones are not substantially similar. The body of the CKT–686 has a slightly different shape than that depicted in the '465 design drawing due to the fact that its face continues at a slant up to the receiver whereas the '465 design appears to level off at the top of the phone. The design and shape of the CKT–686's faceplate are also different from the '465 drawing. The CKT–686 faceplate dips down below the talk button on the left hand side, extends over the LCD display on the right side, and curves below the slanted portion of the phone's face, extending onto the base of the phone. Additionally, there is no separate overlay like the one found at the top of the faceplate in the '465 design.

Several other differences distinguish the CKT–686 from the '465 design. The base portion of the CKT–686 extends higher on the body of the phone than does the analogous part of the '465 design, reaching the top of the coin return. Unlike the '465 design, the instructions for the CKT–686 are found in two locations: in a small area to the left of the number keys and near the top of the face, adjacent to the coin slot. The CKT–686 talk button is located on its slanted face rather than the top of the phone, and is much larger than that pictured in the '465 design. Additionally, there are three buttons, found to the left of the keypad, designated as "follow on," "pause," and "redial" that are not found in the '465 design at all. Finally, the number keys are oval and positioned at a diagonal slant, appearing much different than the round buttons depicted in Eastern's patent design. The Court includes the frontal-view drawing of the '034 design for illustrative purposes only:

Properly limiting the '465 patent to those elements depicted in its patent drawings and not found in prior art or serving functional purposes, the Court finds that the CKT–686 is easily distinguishable from Eastern's patented design. Although dif-

ferences in the detail of the design will not defeat infringement where two designs give substantially the same impression to an ordinary observer,[67] this is not such a situation. The Court does not find the two designs so similar that an ordinary observer, "giving such attention as the purchaser usually gives in buying articles of the kind in question, and for the purposes for which they are intended," [68] would be likely to purchase one thinking it was the other. The faceplate is the only element that might be misleading, and the curved design of the CKT–686's faceplate is different enough from the '465 design that the Court finds they would not easily be confused. The Court notes that a side by side comparison of the two phones submitted by plaintiff gives an initial impression of greater similarity due to their similar size and color schemes [69] but, because the '465 patent does not embody size or color, it cannot be infringed on those bases.[70]

### 2. Point of Novelty Test

Because the Court does not find the two phones substantially similar, the point of novelty test need not be reached. The novelty of the '465 patent is attributable to the same features that the Court found made it non-obvious: its whole-body curved shape, the inset gray faceplate and its unique curved design, the ornamental oval recesses for the talk button and coin slot, and the transparent number keys. These elements combine to give the '465

design an overall appearance that sets it apart from prior art.

Defendants' phone has a similar faceplate, transparent number keys, and a curved body. It is not enough, however, that defendants appropriate some of plaintiff's novel design elements. Without a finding of substantial similarity, there is no infringement.[71] In consequence, the Court finds that defendants' phone does not infringe Eastern's design patent.[72]

### II.

### Trade Dress Infringement

Plaintiff alleges that defendants, in addition to infringing its design patent, have copied distinctive elements of its product configuration and packaging trade dress.[73] Section 43(a) of the Lanham Act provides a private cause of action against any person who, "in connection with any goods ... or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, ... which ... is likely to cause confusion, or to cause mistake, or to deceive ... as to the origin, sponsorship, or approval of his or her goods ... by another person...." [74] Lanham Act protection extends to unregistered trade dress and encompasses all of the elements that make up the overall product image being presented to the consumer, including the design and appearance of the product as well as its packaging.[75] Functional elements of trade dress,

---

67. See 5 ERNEST BAINBRIDGE LIPSCOMB III, WALKER ON PATENTS § 16.24, at 136 (3d ed.1986).

68. *Wilson v. Haber Bros., Inc.*, 275 F. 346, 348 (2d Cir.1921) (quoting *Zidell v. Dexter*, 262 F. 145, 147 (9th Cir.1920)).

69. PX 2, 3.

70. See *Sun Hill Indus., Inc. v. Easter Unlimited, Inc.* 48 F.3d 1193 (Fed.Cir.1995).

71. See *id.* at 1197 (To succeed on an infringement claim, "[t]he patentee must prove both substantial similarity and appropriation of the 'point of novelty.' ").

72. Although the *Gorham* test is phrased in terms of consumer confusion, a trier of fact

may, as a matter of law, rely exclusively on a visual comparison of the patented design, the device that embodies the design, and the accused device's design, making empirical evidence of confusion unnecessary. See *Braun Inc.*, 975 F.2d at 821.

73. Cpt. ¶ 56.

74. 15 U.S.C. § 1125(a).

75. See *Fun–Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 999 (2d Cir.1997) (citing *Jeffrey Milstein, Inc. v. Greger. Lawlor, Roth, Inc.*, 58 F.3d 27, 31 (2d Cir.1995)).

however, are not protectable.[76] Because the elements of infringement of packaging and product configuration trade dress are different,[77] the Court will examine the two separately.

### A. Product Packaging

■ In order to recover for infringement of packaging trade dress under Section 43(a), a plaintiff must prove: (1) that the trade dress is protectable because it is either inherently distinctive or has acquired distinctiveness by achieving a "secondary meaning" in the marketplace [78] and (2) that there is a likelihood of confusion between its product and the defendant's product.[79] Functionality is a defense that may be raised by the defendant.[80]

### 1. Secondary Meaning

Plaintiff asserts that its packaging trade dress has acquired secondary meaning in the marketplace.[81] In order to establish secondary meaning, however, plaintiff " 'must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself.' " [82] Plaintiff has not done this. There is no evidence in the record to support the assertion that the SN–6806's packaging primarily serves to identify the source of the phone.[83] Thus, Lanham Act protection for plaintiff's packaging depends upon whether it is inherently distinctive and whether there is a likelihood of confusion of plaintiff's and defendants' products based on the alleged trade dress infringement.

### 2. Distinctiveness

The distinctiveness of packaging trade dress is evaluated according to Judge Friendly's classic typology enunciated in *Abercrombie & Fitch Co. v. Hunting World, Inc.*,[84] in which putative marks are

---

**76.** *Id.* (citations omitted); *see also Fabrication Enter., Inc. v. Hygenic Corp.*, 64 F.3d 53, 58–59 (2d Cir.1995).

**77.** *See Wal–Mart Stores, Inc. v. Samara Brothers, Inc.,* —— U.S. ——, 120 S.Ct. 1339, 1344–46, 146 L.Ed.2d 182 (2000).

**78.** Prior to the Supreme Court's decision in *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615, *reh'g denied*, 505 U.S. 1244, 113 S.Ct. 20, 120 L.Ed.2d 947 (1992), the Second Circuit required a showing of secondary meaning in order to invoke Lanham Act protection for trade dress. *See, e.g., Vibrant Sales Inc. v. New Body Boutique, Inc.*, 652 F.2d 299, 303 (2d Cir.1981). In *Two Pesos*, the Supreme Court unequivocally stated that inherently distinctive and unfunctional trade dress is protectable under Section 43(a) without a showing that it has acquired secondary meaning. *Two Pesos*, 505 U.S. at 767, 112 S.Ct. 2753. The Supreme Court since has held that product design trade dress cannot be inherently distinctive, and thus requires a showing of secondary meaning to invoke the protection of the Lanham Act for infringement of product design trade dress. *Wal–Mart Stores,* —— U.S. at —— – ——, 120 S.Ct. at 1344–46.

**79.** *See Samara Bros., Inc. v. Wal–Mart Stores, Inc.*, 165 F.3d 120, 124 (2d Cir.1998) (citing *Fun–Damental Too*, 111 F.3d at 999), *rev'd on other grounds*, —— U.S. ——, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000).

**80.** *See Nora Beverages v. Perrier Group of Am.*, 164 F.3d 736, 743 (2d Cir.1998).

**81.** PTO ¶¶ 95–97 (Plaintiff's Contentions).

**82.** *Two Pesos*, 505 U.S. at 766 n. 4, 112 S.Ct. 2753 (quoting *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 851, n. 11, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982)).

**83.** *See, e.g., George. Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1536 (2d Cir.) (factors a court should consider in determining the existence of secondary meaning include: (1) plaintiff's advertising expenditures; (2) consumer surveys linking the trade dress to a particular source; (3) sales success; (4) unsolicited media coverage; (5) attempts to plagiarize the trade dress; and (6) the length and exclusivity of the use), *cert. denied*, 506 U.S. 991, 113 S.Ct. 510, 121 L.Ed.2d 445 (1992); *Sports Traveler, Inc. v. Advance Magazine Publishers, Inc.*, 25 F.Supp.2d 154, 164 (S.D.N.Y. 1998) (same). Plaintiff submitted testimony alleging sales success, but has not addressed any of the other factors.

**84.** 537 F.2d 4 (2d Cir.1976).

classified on a spectrum of increasing distinctiveness as generic, descriptive, suggestive, or arbitrary or fanciful.[85] Generic trade dress receives no protection, descriptive is protected only if it has acquired secondary meaning, and suggestive, arbitrary and fanciful trade dress is "deemed inherently distinctive and ... entitled to protection."[86] The distinctiveness of plaintiff's packaging must be evaluated by looking at all of its elements and considering the total impression it gives the observer.[87]

■ Plaintiff claims that the packaging of the SN–6806 possesses non-functional design elements that form an inherently distinctive trade dress.[88] Under *Abercrombie*, the Court must find that the packaging is suggestive, arbitrary, or fanciful in order for this to be true. Plaintiff claims that the elements that make its packaging distinctive include the red and black sample pay phone, an illustration of a globe, an illustration of a world map having green land masses on a purple background, and a rainbow color bar.[89] Furthermore, plaintiff asserts that the shape of the box itself is distinctive and that defendants changed their own packaging from a flat cardboard box to an "H-shaped" box in order to look more like plaintiff's.[90]

The Court agrees with plaintiff that the combination of a world map made up of green land masses on a purple globe, a rainbow color stripe, and the sample telephone set against the half white, half purple background is arbitrary and fanciful, and therefore inherently distinctive. As the Second Circuit has recognized, most packaging trade dress is arbitrary, fanciful, or suggestive because of the " 'virtually unlimited' " choice of packaging and labeling materials available.[91] Even if the individual elements are generic, the combination chosen by plaintiff creates a distinctive trade dress.

This does not lead the Court to conclude, however, that defendants' box infringes plaintiff's packaging trade dress. Although defendants' box contains elements found in plaintiff's box, there is little likelihood of confusion of the products based on their packaging.

### 3. Likelihood of Confusion

■ The likelihood of confusion is analyzed using eight factors articulated by the Second Circuit in *Polaroid Corp. v. Polarad Electronics Corp.*,[92] which are: (1) the strength of the plaintiff's trade dress, (2) the similarity between the two trade dresses, (3) the proximity of the products in the marketplace, (4) the likelihood that the prior owner will bridge the gap between the products, (5) evidence of actual confusion, (6) the defendants' bad faith, (7) the quality of defendants' product, and (8) the sophistication of the relevant consumer group. The Court will examine each factor in turn.

### (i) Strength of the Trade Dress

The strength of plaintiff's trade dress depends in part on its classification on the *Abercrombie* spectrum, but more importantly on its " 'tendency to identify the goods sold as emanating from a particular source, even when the source is unknown

85. *Id.* at 9; *see also Paddington Corp. v. Attiki Importers & Distributors, Inc.*, 996 F.2d 577, 583 (2d Cir.1993) (adopting *Abercrombie* test to evaluate inherent distinctiveness of product packaging).

86. *Two Pesos*, 505 U.S. at 768, 112 S.Ct. 2753; *see also Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 377 (2d Cir.1997); *Paddington Corp.*, 996 F.2d at 583.

87. *Fun–Damental Too*, 111 F.3d at 1001.

88. PTO ¶ 97 (Plaintiff's Contentions).

89. Cpt. ¶ 54. The Court finds the phone to be red and gray, as opposed to red and black.

90. PTO ¶ 89 (Plaintiff's Contentions).

91. *Nora Beverages*, 164 F.3d at 743 (quoting *Fun–Damental Too*, 111 F.3d at 1000).

92. 287 F.2d 492, 495 (2d Cir.1961).

to the consumer.' " [93] Although the Court has found that plaintiff's packaging is distinctive, it found also that the packaging does not *primarily* serve to identify the source of its product.[94] Thus, its trade dress is not particularly strong.

### (ii) Similarity of the Trade Dress

In assessing the similarity of the two marks, courts look to whether the similarity is likely to cause consumer confusion. As the Second Circuit has stated, "[t]he test ... is not whether confusion is possible; nor is it whether confusion is probable among customers who are not knowledgeable. Rather, the test ... is whether confusion is probable among numerous customers who are ordinarily prudent." [95] Applying that test to these two trade dresses, the Court finds that defendants' packaging is not sufficiently similar to cause such confusion.

The shapes of the boxes are similar, but their overall appearances are very different. For example, plaintiff's box has either a blue top with blue sides or a black top with red sides – both versions have a rainbow color bar separating the top from the bottom, and text covering the ends.[96] The broad side of the box is clearly marked "Sonitek" and is divided in half, with one side a light colored background and the other a purple globe with green continents, over which the sample gray

and red phone sits. The color scheme is bold and the graphics are sharp.

Defendants' box, on the other hand, is lavender from top to bottom, has a green globe on two corners, and unidentifiable green graphics scattered throughout.[97] CKT's logo [98] and a cartoon character mascot are clearly visible,[99] while the phone's features are listed in colored squares ringing the top of the box. Like the Sonitek box, there is a red and gray phone pictured on each of the broad sides of the box but, unlike plaintiff's carton, defendants' box also shows an ivory and gray model. In addition, although the box shapes are similar, their sizes are different – the CKT–686 box is noticeably smaller than the SN–6806 box. In conclusion, although there are some similarities between the boxes, their color schemes and overall appearances are quite different. This makes the likelihood of confusion slim in both side by side comparisons as well as individually, the context in which consumers are most likely to see them.

### (iii) Proximity of the Products

The proximity factor considers to what extent the two products compete against each other, the nature of the products themselves, and the structure of the relevant market.[100] The parties here are direct competitors in the U.S. telecommunications products market, and both conduct business through the use of sales catalogs.[101] The products serve the same func-

93. *Fun–Damental Too,* 111 F.3d at 1003 (quoting *Centaur Communications, Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1225 (2d Cir.1987)).

94. *See supra* Parts II.A.1 and II.A.2.

95. *Morningside Group Ltd. v. Morningside Capital Group, L.L.C.,* 182 F.3d 133, 139–40 (2d Cir.1999) (quoting *Estee Lauder Inc. v. The Gap, Inc.,* 108 F.3d 1503, 1511 (2d Cir. 1997)).

96. *See* PX 5–1, 5–2 (plaintiff's boxes).

97. *See* PX 6 (defendants' box).

98. Since institution of this lawsuit CCKT reorganized and changed its name to Ching Kong

Tech Int'l Co., Ltd. ("CKT"). PX 49 (Jimmy Chien) ¶ 6.

99. An analysis of the likelihood of confusion must include consideration of any labeling by defendant that might tend to dispel confusion as to the origin, sponsorship or approval of the goods in question. *See Nora Beverages,* 164 F.3d at 744 (quoting *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.,* 973 F.2d 1033, 1046 (2d Cir.1992)).

100. *See Morningside Group Ltd.,* 182 F.3d at 140 (citations omitted).

101. PTO ¶¶ 8, 14–16, 19.

tion and have similar appearances. Each of these measures of proximity weighs in favor of a finding of likelihood of confusion.

### (iv) Likelihood of Bridging the Gap

The considerations that make the products so close in proximity simultaneously decrease the possibility that plaintiff will, at some future time, expand into a related field to compete against defendants, which is referred to as "bridging the gap."[102] Since plaintiff and defendants are already direct competitors in the same market, the gap has been bridged. In these circumstances, this factor should be given little weight in the *Polaroid* balance.

### (v) Actual Confusion

To prove actual confusion, plaintiff submitted testimony that Eastern "frequently receive[s] telephone calls on Eastern's toll free [sic] in which customers have complained about Defendants' telephones ... believing them to be telephones from Eastern."[103] It further claims that customers have attempted to return defendants' telephones to Eastern, "under the mistaken belief that they originated with Eastern" and that Eastern regularly receives complaints from customers who have been confused.[104] Phone calls to the wrong party and a mistaken belief that plaintiff is the vendor of defendants' products have been held relevant to a finding of actual confusion which, in turn, is a strong indicator that confusion is likely.[105]

The Court notes, however, that plaintiff's testimony is vague and completely unsubstantiated. It has not submitted supporting documentation for its assertions, nor provided the Court with any idea of how many phone calls it has received, from whom, or within what time period. Plaintiff has not indicated how often attempted returns have taken place or how frequently customers have complained about confusion. This makes it difficult for the Court to evaluate the weight of the evidence and decreases its value as a factor in this analysis.[106]

### (vi) Defendants' Bad Faith

The plaintiff alleges that defendants intentionally copied its packaging design in order to trade on plaintiff's good will.[107] The only evidence that supports this assertion is found in testimony submitted by plaintiff. Momentarily assuming that defendants did copy aspects of plaintiff's trade dress, bad faith cannot be inferred simply from the fact of copying. There are valid reasons that a defendant might copy his competitor's trade dress, "wholly apart from a desire to confuse consumers," which might include a belief that the trade dress is functional or generic, or that copying would be the best way to inform consumers about a lower-priced alternative.[108] In the absence of persuasive evidence to the contrary, the Court concludes that defendants did not act with an intent to confuse.

---

**102.** *See Morningside Group Ltd.,* 182 F.3d at 141; *Streetwise Maps. Inc. v. Vandam, Inc.,* 159 F.3d 739, 743 (2d Cir.1998).

**103.** PX 52 (Harap) ¶ 24. *See also* PX 50 (Judy Chien) ¶ 90; PX 49 (Jimmy Chien) ¶ 90.

**104.** PX 52 (Harap) ¶¶ 25–26.

**105.** *See Morningside Group Ltd.,* 182 F.3d at 141–42.

**106.** A trade dress plaintiff must prove actual confusion in order to obtain damages, but the failure to make such proof does not prevent the Court from granting injunctive relief. *See Nora Beverages,* 164 F.3d 736, 745 (2d Cir. 1998) (citing *Coach Leatherware Co. v. Ann-Taylor, Inc.,* 933 F.2d 162, 171 (2d Cir.1991)).

**107.** PTO ¶ 89 (Plaintiff's Contentions); *see also* PX 49 (Jimmy Chien) ¶ 85; PX 50 (Judy Chien) ¶ 85.

**108.** *See Fun–Damental Too,* 111 F.3d at 1005 (citing Andrew C. Finch, *When Imitation is the Sincerest Form of Flattery: Private Label Products and the Role of Intention in Determining Trade Dress Infringement,* 63 U. CHI. L.REV. 1243, 1255 (1996)).

One aspect of defendants' packaging trade dress that is suspiciously similar to that of plaintiff's is its model number. The Court finds it unlikely that CCKT and plaintiff would have selected such similar model numbers independently but does not have before it any evidence upon which to base a finding that defendant infringed plaintiff's model number. Although the SN–6806 was offered for sale prior to the CKT–686,[109] the only explanation given for either model number tends to substantiate the independent selection of CKT–686 rather than SN–6806. Wan–Neng Chuang, co-inventor of the SN–6806, testified that CCKT's system of model numbers involves replacing the second of three digits to indicate a newer model.[110] For example, the CKT–929 was updated and became the CKT–939. Similarly, CCKT's model number CKT–676 which, unlike the CKT–679, has been proven to exist, would have become the CKT–686. The record contains no explanation for plaintiff's choice of SN–6806. Thus, the Court finds that the two model numbers are similar, but cannot deduce whether CCKT copied plaintiff or plaintiff anticipated CCKT's numbering system and deliberately chose a number that would be similar to defendants' next offering. In consequence, the Court makes no finding of bad faith based on the similarity of the model numbers at issue.

### (vii) Quality of Defendants' Product

Quality weighs against a defendant "when there is an allegation that a low quality product is taking unfair advantage of the public good will earned by a well-established high quality product."[111]

Plaintiff claims that defendants' phones are of a much lower quality than its own, and that they are known in the industry as such.[112] Plaintiff further asserts that defendants' phones are difficult to program and have repeatedly had mechanical problems.[113]

Plaintiff's assertions are unsubstantiated, and the Court has been unable to compare the quality of the phones. As a result, the Court finds this factor inconclusive and of little importance in the determination of a likelihood of confusion.

### (viii) Sophistication of Consumers

The parties have not submitted evidence bearing directly on a determination of the sophistication of their consumers. Plaintiff asserts that the purchasers of these kinds of table top pay phones include owners of stores and businesses, restaurants, bars and pubs, laundromats, offices, barber shops, beauty salons, nightclubs, and motels.[114] This indicates to the Court that consumers of the product at issue are not particularly sophisticated or specialized in the area of table top phones, but rather are infrequent purchasers seeking to serve the tangential needs of their customers. On the other hand, the Court acknowledges defendants' point that these phones are not sold in stores, but via sales catalogs, and agrees that this greatly decreases the risk that consumers would be confused as to the source of the products regardless of their level of sophistication.[115]

### 4. Balancing the Polaroid Factors

██ On balance, the Court concludes that confusion as to the source of plaintiff's

---

109. The SN–6806 entered in the market in approximately October, 1997 and the CKT–686 was created in early 1998. Wan–Neng Chuang Cert. ¶ 46; Tang Decl. ¶ 9.

110. Wan–Neng Chuang Cert. ¶ 31.

111. *Gruner + Jahr USA Publishing v. Meredith Corp.*, 991 F.2d 1072, 1079 (2d Cir.1993).

112. PX 52 (Harap) ¶ 19; *see also* PX 50 (Judy Chien) ¶ 92; PX 49 (Jimmy Chien) ¶ 92.

113. PX 52 (Harap) ¶¶ 20, 21; *see also* PX 50 (Judy Chien) ¶ 92; PX 49 (Jimmy Chien) ¶ 92.

114. PX 52 (Harap) ¶ 12.

115. *See Landscape Forms*, 113 F.3d at 376 (citing sales through catalogs that identify the manufacturer as factor favoring defendant in trade dress suit).

and defendants' products on the basis of their packaging is unlikely. The strength of plaintiff's trade dress, the proximity of the products, and even plaintiff's evidence of actual confusion are, in the eyes of the Court, far outweighed by the fact that the overall appearance of the packaging at issue is so dissimilar. The remainder of the *Polaroid* factors carry little weight in this analysis for the reasons set forth above. In consequence, plaintiff's claim for packaging trade dress infringement fails due to plaintiff's failure to demonstrate a likelihood of confusion between its product and defendants' product based on their respective packaging.

### B. Product Configuration

■ Following the Supreme Court's recent decision in *Wal–Mart Stores, Inc. v. Samara Brothers, Inc.*,[116] recovery for product design trade dress infringement under Section 43(a) requires a showing that (1) the trade dress has acquired a secondary meaning in the marketplace, and (2) there is a likelihood of confusion of the allegedly infringed and infringing products.[117]

In *Wal–Mart Stores*, the Court held that unregistered product design trade dress cannot be inherently distinctive[118] and therefore concluded that product design, or configuration, is protected under Section 43(a) only upon a showing that it has acquired a secondary meaning.[119] The Court reasoned that (1) product design

almost invariably serves purposes other than source identification, and (2) "[c]onsumers should not be deprived of the benefits of competition with regard to the utilitarian and esthetic purposes that product design ordinarily serves by a rule of law that facilitates plausible threats of suit against new entrants based upon alleged inherent distinctiveness."[120] Thus, the success of plaintiff's product configuration trade dress claim depends in the first instance on a showing of secondary meaning.

■ Plaintiff contends that its product configuration trade dress has acquired a secondary meaning in the marketplace,[121] but has not shown that the primary significance of its product configuration, in the minds of the public, is to identify the product's source.[122] Thus, plaintiff has not proven that its product configuration has achieved a secondary meaning, and its claim of trade dress infringement must fail.

### III.

### Copyright Infringement

■ Plaintiff accuses defendant Tang of copying original photographs found in its sales catalogs and flyers and using them in Tang's own competing sales catalogs.[123] There are two basic elements to a copyright infringement action: (1) ownership of a valid copyright by plaintiff,

---

**116.** —— U.S. ——, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000).

**117.** Even before the Supreme Court's ruling in *Wal–Mart Stores*, the test for product design trade dress infringement had been undergoing change in the Second Circuit. In *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1007 (2d Cir.1995), the Circuit made clear that the *Abercrombie* test for distinctiveness was inappropriate in evaluating product design trade dress claims, and replaced that test with an inquiry into whether a particular design was likely to be understood as an indicator of the product's source. *See also Landscape Forms*, 113 F.3d at 378.

**118.** *Wal–Mart Stores*, 120 S.Ct. at 1344.

**119.** *Id.* 120 S.Ct. at 1345.

**120.** *Id.* at 1344.

**121.** PTO ¶¶ 95–97 (Plaintiff's Contentions).

**122.** *See Two Pesos*, 505 U.S. at 766 n. 4, 112 S.Ct. 2753.

**123.** Plaintiff's claim of copyright infringement makes no mention of Digital Import and, as such, this Court addresses only the rights and obligations of defendant Tang in this portion of the opinion. Cpt. ¶¶ 25–49.

and (2) copying by the defendant.[124] The second element is generally established by a showing that the defendant had access to the copyrighted work and that there is a substantial similarity of protectable material between the two works.[125]

Plaintiff has registered copyrights on each of the allegedly infringed catalogs and flyer[126] and has marked the covers of the catalogs and each individual page of the catalogs and flyer with a valid copyright notice.[127] Defendant Tang does not deny that it directly copied some of the photographs found in plaintiff's catalogs, but argues that its catalogs are not sufficiently similar to plaintiff's catalogs to support a finding that Tang has infringed plaintiff's compilations and, in any case, that the photographs at issue lack sufficient originality or creativity to be copyrightable.[128]

### A. The Nature of Plaintiff's Copyright Protection

Plaintiff's copyrighted catalogs are compilations.[129] The test for infringement is whether there exists substantial similarity between the protectable elements of the allegedly infringed and infringing works.[130] Tang therefore argues that there is no infringement because the catalogs as a whole are not similar. What Tang overlooks, however, is that plaintiff did not

simply compile photos that were found in the public domain. Eastern's catalogs contain original photographs created by and belonging to Eastern that are not found in the public domain.[131] Thus, Eastern accuses Tang of infringing individual, original, and protected photographs, while Tang defends itself by arguing that it has not infringed the catalogs themselves.

### 1. Copyright Protection for Compilations

■ Copyright protection for compilations is more limited than copyright protection for individual works because compilations generally are made up of components found within the public domain.[132] The originality of the compiled work usually lies in its arrangement or organizing principle, which generally is the extent of the contribution of the author of the compilation.[133] Because a copyright in a compilation or derivative work protects only the material actually contributed by its author,[134] the test for infringement of compilations is one of substantial similarity between the allegedly infringing work and the original elements of the allegedly infringed compilation, such as the selection, coordination, and arrangement of its components.[135]

**124.** *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991) (citing *Harper & Row Publishers, Inc. v. Nation Enter.*, 471 U.S. 539, 548, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985)).

**125.** *See, e.g., Kregos v. Associated Press*, 3 F.3d 656, 662 (2d Cir.1993), *cert. denied*, 510 U.S. 1112, 114 S.Ct. 1056, 127 L.Ed.2d 376 (1994).

**126.** *See* 17 U.S.C. §§ 101 *et seq.*

**127.** *See* 17 U.S.C. § 401; PX 8–1, 8–2, 8–3.

**128.** *See* Tr. 49–59: Def. Bench Mem. on Copyright Infringement.

**129.** 1 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 3.02, at 3–5 (1999) (hereinafter NIMMER).

**130.** *See Key Publications, Inc. v. Chinatown Today Publishing Enterprises, Inc.*, 945 F.2d 509, 514 (2d Cir.1991).

**131.** Judy Chien Cert. ¶ 42.

**132.** *See Feist Publications*, 499 U.S. at 359, 111 S.Ct. 1282 ("Even if a work qualifies as a copyrightable compilation, it receives only limited protection.").

**133.** *See, e.g., Key Publications*, 945 F.2d at 514–16.

**134.** 17 U.S.C. § 103(b).

**135.** *See Key Publications*, 945 F.2d at 514.

## 2.  Eastern's Copyrights

As a rule, a certificate of registration from the Copyright Office constitutes *prima facie* evidence that the copyright is valid.[136] Plaintiff has submitted the certificates of registration for two catalogs and a flyer, demonstrating to the Court that it has valid copyrights for each of the three publications.[137] The question implicitly raised by Tang's defense is whether Eastern's copyrights cover only the compilations in their entireties, in which case the appropriate test for infringement would be substantial similarity of the catalogs as Tang asserts, or whether those registrations serve also to protect the individual photographs found in the catalogs.

When Eastern registered its Trisonic 1994 Catalog, it indicated that it was a derivative work, listed previous volumes of the catalog that never were registered with the Copyright Office as preexisting material, and specified that it had added "new product descriptions, all artwork, and photographic work."[138] When Eastern registered its Trisonic 1998 Catalog, it claimed authorship of and copyright in the "[e]ntire work," indicated that it was a compilation and a changed version of the Trisonic 1994 Catalog, and listed "[n]ew products and new photographs and revisions of text" as material that was added to create the 1998 catalog.[139] Eastern reg-

istered the 1997 Flyer as a catalog but did not indicate that it was a derivative work or a compilation.[140]

■ Several judges of this Court have found that registration of a collective work satisfies the registration requirements for bringing an action for infringement of its constituent parts.[141] In *Greenwich Film Productions, S.A. v. DRG Records, Inc.,*[142] for example, the court found that the plaintiff was entitled to register musical compositions that made up the soundtrack of a motion picture, for which it was also the copyright claimant, together with the film in a single application.[143] The court's reasoning was based in part on the language of the copyright regulations which state that "for the purpose of registration on a single application and upon payment of a single registration fee. the following shall be considered a single work: ... All copyrightable elements that are otherwise recognizable as self-contained works, that are included in a single unit of publication, and in which the copyright claimant is the same...."[144]

■ This is consistent with a substantial body of case law holding that a proprietor of a composite work is entitled to the rights he or she would have if each part were copyrighted individually.[145] Although many of these cases were decided pursu-

**136.**  17 U.S.C. § 410(c); *see also Fonar Corp. v. Domenick,* 105 F.3d 99, 104 (2d Cir.1997).

**137.**  *See* PX 12–1, 12–2, 12–3.

**138.**  PX 12–1.

**139.**  PX 12–3.

**140.**  PX 12–2.

**141.**  *See Woods v. Universal City Studios, Inc.,* 920 F.Supp. 62, 64 (S.D.N.Y.1996); *Greenwich Film Productions, S.A. v. DRG Records, Inc.,* 833 F.Supp. 248, 251–52 (S.D.N.Y. 1993); *Heyman v. Salle,* 743 F.Supp. 190, 193 (S.D.N.Y.1989).

**142.**  833 F.Supp. 248 (S.D.N.Y.1993).

**143.**  *Greenwich Film Productions,* 833 F.Supp. at 250.

**144.**  37 C.F.R. § 202.3(b)(3)(i)(A) (1999).

**145.**  *See, e.g., Markham v. A.E. Borden Co.,* 206 F.2d 199 (1st Cir.1953) (advertising catalogs); *King Features Syndicate v. Fleischer,* 299 F. 533, 535 (2d Cir.1924) (cartoons); *Bliss & Laughlin Industries, Inc. v. Starvaggi,* 188 U.S.P.Q 89, 93 (S.D.N.Y.1975) (product catalog); *Rexnord, Inc. v. Modern Handling Sys., Inc.,* 379 F.Supp. 1190, 1195 (D.Del.1974) (same); *National Council of Young Israel, Inc. v. Feit Co.,* 347 F.Supp. 1293, 1296 (S.D.N.Y. 1972) (same); *PIC Design Corp. v. Sterling Precision Corp.,* 231 F.Supp. 106, 109 (S.D.N.Y.1964) (same).

ant to Section 3 of the Copyright Act of 1909,[146] it is clear that Congress intended to continue to protect the copyrightable components of a compilation, particularly where the components are original works of the author and copyright holder of the compilation.[147] The 1976 Act provides that copyright protection attaches to original, copyrightable works at the time that they become fixed in a tangible medium of expression,[148] that copyright extends to all material contributed by the author of a compilation,[149] and that separate contributions to a collective work may be protected by a single notice applicable to the collective work as a whole.[150]

▮ Informed by the reasoning of *Greenwich Film Productions* and many courts before it, as well as the plain language of the statute, this Court holds that Eastern's registration of its catalogs gives it the right to sue for infringement of each original, copyrightable work that it contributed to them. Moreover, by subsequently placing copyright notices on each page of those publications, plaintiff placed defendants on notice that each of the copyrightable works in the catalogs and flyer was protected.[151] The next question the Court addresses, therefore, is whether the photos at issue are in fact copyrightable.

### 3. The Copyrightability of the Photographs

▮ Tang contends that even if it did copy the photos, they were pictures of common, industrial items, lacking sufficient originality or creativity to be protectable by copyright.[152] It is mistaken.

There is a very broad scope for copyright in photographs, encompassing almost any photograph that reflects more than "slavish copying."[153] The necessary originality for a photograph may be founded upon, among other things, the photographer's choice of subject matter, angle of photograph, lighting, determination of the precise time when the photograph is to be taken, the kind of camera, the kind of film, the kind of lens, and the area in which the pictures are taken.[154]

The photographs at issue are the products of Eastern's own creative work. Judy Chien personally supervised the layout of the items that were photographed, positioned them in what she thought an attractive manner, selected particular angles and lighting, and in some cases even had the images enhanced by a computer to achieve the desired outcome.[155] The creative elements asserted here satisfy the minimal originality requirement for copyright. The fact that the photos are of common industrial items does not affect

146. Prior to 1976, 17 U.S.C. § 3 (1975), expressly provided:
"The copyright provided by this title shall protect all the copyrightable component parts of the work copyrighted, and all matter therein which copyright is already subsisting, but without extending the duration or scope of such copyright. The copyright upon composite works or periodicals shall give to the proprietor thereof all the rights in respect thereto which he would have if each part were individually copyrighted under this title."

147. *See* 17 U.S.C. §§ 102, 103 (which replaced 17 U.S.C. § 3).

148. 17 U.S.C. § 102(a).

149. *Id.* § 103(b).

150. *Id.* § 404(a).

151. *See id.* § 401(d).

152. *See* Tr. 51–56; Def. Bench Mem. on Copyright Infringement.

153. *See Bridgeman Art Library, Ltd. v. Corel Corp.*, 36 F.Supp.2d 191, 196 (S.D.N.Y.1999) (citations omitted).

154. *See Rogers v. Koons*, 960 F.2d 301, 307 (2d Cir.), *cert. denied*, 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992); *accord Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, 116 (2d Cir.1998); 1 NIMMER § 2.08[E][1], at 2–130.

155. Judy Chien Cert. ¶ 42; PX 50 (Judy Chien) ¶¶ 66, 70; Witness Statement of Judy Chien (Reply) ¶¶ 32, 37, 39, 41.

their copyrightability. In fact, a photographer's "efforts to create an aesthetically attractive, technically competent photograph" of fishing gear have been held to be "plainly creative expressions."[156] The same certainly can be said for plaintiff's photographs of electrical products. In consequence, the Court finds plaintiff's photographs were copyrightable and protected by plaintiff's registrations with the Copyright Office.

## B. Infringement

■ Having established that it possesses valid copyrights for each of the photographs at issue, the next element that plaintiff must prove is that Tang copied those photographs. As stated above, this may be done by proving that Tang had access to the catalogs and flyer and that there is a substantial similarity between the photographs in those publications and the photographs allegedly copied from them.

Plaintiff alleges that Tang had clear access to the catalogs, and submits testimony that the catalogs have been widely distributed throughout the United States and are readily available to any member of the public.[157] Additionally, plaintiff submitted testimony that thousands of its catalogs have been distributed at trade shows attended by Tang.[158] The Court finds that Tang had ample access to plaintiff's publications.

Some of the photographs appearing in Tang's catalogs obviously were copied directly from plaintiff's catalogs. In certain cases, Tang reproduced photographic errors in Eastern's illustrations;[159] in others

Tang included computer-enhanced images in its catalogs that are identical to those created by Eastern.[160] The Court finds the likelihood of Tang and Eastern, for example, independently superimposing bundles of speaker cable to create the same crossover "X" configuration extremely slim.

In some cases the copying is not so blatant, but examination reveals that other photographs in both catalogs are so similar that they must be the result of copying.[161] The identical yet arbitrary angles of wires and placement of the free ends of cords make it unlikely that certain photographs are not copies of plaintiff's original work. Tang itself concedes that it copied approximately twenty-five of plaintiff's original photographs.[162] The Court concludes that protectable elements of plaintiff's work, to wit, original product photographs appearing in plaintiff's sales catalogs, would be recognized easily by an ordinary observer as substantially similar to product photos appearing in Tang's catalogs.

For reasons explained below, the Court need not determine the precise number of photographs that have been infringed, but rather the number of catalogs from which the infringed photographs were copied. The Court finds that there is substantial similarity between photographs appearing in various catalogs belonging to Tang and photographs contained in plaintiff's 1994 and 1998 Trisonic catalogs to prove infringement of plaintiff's copyright. The Court does not, however, find that there is sufficiently substantial similarity between photographs appearing in Tang's catalogs

**156.** *See Strauss v. Hearst Corp.*, No. 85 Civ. 10017(CSH), 1988 WL 18932, *5 (S.D.N.Y. Feb. 19, 1988).

**157.** PX 50 (Judy Chien) ¶ 63.

**158.** *Id.*

**159.** *See* PX 21–6 (Tang's catalog), 21–25 (Eastern's catalog) (photo of power cord with diagonal white smudge on label appears in both).

**160.** *See, e.g.*, Reply Statement of Judy Chien ¶¶ 36–38, 41–42; *compare* PX 20–5, 21–7, 23–4 (Tang's catalogs) *with* PX 20–23, 21–33, 23–11 (Eastern's catalogs).

**161.** *See, e.g.*, PX 21–5, 21–31, 23–3, 23–6.

**162.** Tr. 57; Def. Summary of Plaintiff's Exhibits (submitted with Def. Bench Mem. on Copyright Infringement).

and plaintiff's 1997 Flyer to demonstrate copying of that work.[163]

## C. Damages

■ In an action for copyright infringement, the copyright owner may elect to recover either statutory damages or its actual damages plus defendant's profits.[164] Plaintiff has not made an explicit election in this case, but has offered no proof of actual damages or Tang's profits or gross revenue.[165] The Court proceeds on the assumption that Eastern elects an award of statutory damages.

■ The relevant statute provides that the Court may award "not less than $750 or more than $30,000 [for each work infringed] as the court considers just," but in the case of willful infringement the court may, in its discretion, increase the award to not more than $150,000 per work infringed.[166] Similarly, if the infringer can prove that it was not aware and had no reason to believe that his or her acts constituted infringement the court may, in its discretion, reduce the award to a sum of not less than $200 per work infringed.[167] Although the statute does not afford much guidance as to how courts are to fix appropriate amounts in statutory damages

cases, earlier cases instruct that a court may consider the defendant's intent, the need to deter future violations, and the economic benefits and detriments to the plaintiff and defendant when determining damage amounts.[168]

■ The paucity of evidence presented to the Court makes it impossible to determine the economic benefits and detriments to either party resulting from the copyright infringement. It seems obvious that Tang saved itself the costs of producing several of the photographs contained in its catalogs, but the Court has nothing before it with which to approximate Tang's profits from the use of the infringed photos. Likewise, Eastern has not demonstrated any lost profits as a result of the infringement. Thus, the Court relies primarily on the fact that Tang acted willfully in copying a number of plaintiff's photographs, blatantly disregarding the clear copyright notice appearing on each page of plaintiff's catalogs, and the need to deter Tang and others from committing similar violations in the future. In light of the foregoing, the Court fixes the amount of statutory damages at $12,500 per infringed work.[169]

---

163. *See* PX 14 (plaintiff's list of copyright infringements by Tang listing only three pages from the 1997 flyer, none of which contain photographs that the Court finds to be similar enough to evidence copying by Tang). Plaintiff alleges that its infringed photograph of a POWTECH extension cord appears in both its 1997 flyer and its 1998 catalog. Cpt. ¶ 65. The photograph that appears in the 1997 flyer, however, is not the same photograph that appears in Tang's catalogs or Eastern's 1998 catalog. The photograph in the 1997 flyer does not have the same white smudge as the others, nor are the ends of the cord positioned in the same manner. Thus, plaintiff has not proven that the photograph in its 1997 flyer was copied by Tang. *Compare* PX 8–2–12 *with* PX 22–8 and 22–28.

164. 17 U.S.C. § 504(a).

165. In order to establish the infringer's profits, the copyright owner must present proof of the infringer's gross revenue. 17 U.S.C. § 504(b).

166. *Id.* § 504(c).

167. *Id.*

168. *See Guess?, Inc. v. Gold Center Jewelry*, 997 F.Supp. 409, 411 (S.D.N.Y.), *rev'd on other grounds sub nom. Gucci America, Inc. v. Gold Center Jewelry*, 158 F.3d 631 (2d Cir. 1998); *see also F.W. Woolworth Co. v. Contemporary Arts, Inc.*, 344 U.S. 228, 233, 73 S.Ct. 222, 97 L.Ed. 276 (1952); *N.A.S. Import Corp. v. Chenson Enter., Inc.*, 968 F.2d 250, 252–53 (2d Cir.1992); *Fitzgerald Publishing Co. v. Baylor Publishing Co.*, 807 F.2d 1110, 1117 (2d Cir.1986).

169. The statutory range provided in 17 U.S.C. § 504(c) was increased recently. The Court need not decide whether the current or the prior range governs this case as it would reach the same result under either range.

For purposes of determining statutory damages, all the parts of a compilation or derivative work constitute one work.[170] In other words, although the Court has found that Tang copied multiple independently copyrightable photographs, statutory damages may be awarded solely for each compilation that was infringed.[171] Plaintiff has submitted proof of copyright registration and established infringement of only two works: the Trisonic 1994 Catalog and the Trisonic 1998 Catalog. In consequence, plaintiff is entitled to statutory damages for infringement of two compilations for a total amount of $25,000.[172]

## D. Attorney's Fees

■ The Court may, in its discretion, award a reasonable attorney's fee to the prevailing party.[173] In light of Tang's willful infringement of plaintiff's original photographic works, the Court will award costs and reasonable attorney's fees for work relating solely to the copyright claim in an amount to be determined on motion.

## IV.

### Common Law of Unfair Competition

In addition to the statutory claims discussed above, plaintiff asserts a claim of common law unfair competition against defendants arising from their use of imitations of plaintiff's products and packaging

and Tang's copying of plaintiff's photographs.[174] The Court previously has disposed of plaintiff's claim with regard to the copying of its photographs[175] and now turns to the unfair competition claims relating to the alleged imitation of plaintiff's' products and packaging.

### A. Elements of Unfair Competition

■ Under New York common law, the " 'essence of unfair competition ... is the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods.' "[176] In order to prevail on an unfair competition claim, plaintiff must (1) prove the existence of actual confusion, if seeking damages, or a likelihood of confusion in order to obtain equitable relief, and (2) show that defendants acted in bad faith.[177]

### i. Actual Confusion

Plaintiff has submitted evidence of actual confusion to the Court. As stated previously, however, the Court is reluctant to give great weight to the unsubstantiated testimony of plaintiff's witnesses on this issue.[178] There are many ways in which plaintiff could have documented evidence of actual confusion, none of which it chose to implement. In consequence, the Court finds that plaintiff has not proven by a

---

170. 17 U.S.C. § 504(c)(1).

171. See Stokes Seeds Ltd. v. Geo. W. Park Seed Co., 783 F.Supp. 104 (W.D.N.Y.1991).

172. Because the remedies for plaintiff's claim of unfair competition arising from infringement of its copyrights are no greater than those imposed by the Court for Tang's copyright violations, the Court denies plaintiff's claim of unfair competition related to Tang's copying of its photographs. The Court does not find Tang's conduct sufficiently "gross, wanton, or willful[ly] fraud[ulent]" to merit punitive damages for unfair competition. See Getty Petroleum Corp. v. Island Transportation Corp., 878 F.2d 650, 657 (2d Cir.1989) (internal quotes omitted); see also Walker v. Sheldon, 10 N.Y.2d 401, 404–05, 223 N.Y.S.2d 488, 490–91, 179 N.E.2d 497 (1961).

173. 17 U.S.C. § 505.

174. Cpt. ¶¶ 78–80.

175. See supra note 171.

176. Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc., 58 F.3d 27, 34 (2d Cir.1995) (quoting Rosenfeld v. W.B. Saunders, A Division of Harcourt Brace Jovanovich, Inc., 728 F.Supp. 236, 249–50 (S.D.N.Y.1990) (internal quotations omitted)).

177. Jeffrey Milstein, 58 F.3d at 35.

178. See supra Part II.A.3(v).

preponderance of the evidence that the imitation of plaintiff's product or packaging has resulted in actual confusion between its products and defendants'.

## 2. Likelihood of Confusion

Because the Court does not find that plaintiff has sustained its burden with regard to actual confusion, the Court must determine whether plaintiff has satisfactorily demonstrated that a likelihood of confusion exists. The Court previously conducted a *Polaroid* analysis to make this determination with regard to the parties' packaging trade dress and concluded that there is no likelihood of confusion of resulting from plaintiff's and defendants' packaging.[179] Plaintiff therefore has failed to make the showing of confusion necessary to prevail on its claim of unfair competition relating to defendants' alleged imitation of plaintiff's packaging, and the Court need not proceed to a determination of whether there was bad faith on defendants' part.

With regard to product configuration, however, plaintiff failed to satisfy a threshold element of its trade dress infringement claim and so the Court did not make a determination as to whether a likelihood of confusion exists based on plaintiff's and defendants' product design. The Court proceeds to this determination now.

### (i) Strength of the Trade Dress

The Court does not find plaintiff's product trade dress particularly strong. It is not clear to the Court that the configuration of the SN–6806 identifies the source of the phone, or that it comes from any particular source.

### (ii) Similarity of the Product Configuration

The Court finds it improbable that ordinarily prudent consumers would confuse the SN–6806 and the CKT–686. Although they are comparably sized table top pay phones with many common features, they are not so similar that someone interested enough to be purchasing one of them would not notice a difference. The phones are distinguishable for a number of reasons, including the different size and shape of their number keys, the different curved designs on their faces, and the different shapes and locations of their talk buttons. In addition, the CKT–686 features three buttons to the left of the number keypad that are not found on the SN–6806 at all. It is probable that an interested and ordinarily prudent customer would notice these distinctions. The Court does not, therefore, find that this factor weighs in favor of a likelihood of confusion.

### (iii) Proximity of the Products

The proximity factor weighs in plaintiff's favor. The parties here are direct competitors in the U.S. telephone and related telecommunications products market, conduct their business in a similar manner (through the use of sales catalogs),[180] and the products at issue serve the same function within the relevant market.

### (iv) Likelihood of Bridging the Gap

Because of the proximity of the products in the market, this factor is not entitled to much weight in the analysis of a likelihood of confusion.

### (v) Actual Confusion

As described previously, plaintiff has submitted unsubstantiated, testimonial evidence of actual confusion.[181] Evidence of misdirected phone calls and inquiries ordinarily weighs heavily in favor of plaintiff, but in this case the Court does not find plaintiff's evidence very persuasive due to a complete lack of quantitative and documentary support.

---

**179.** *See supra* Part II.A.4.

**180.** PTO ¶¶ 2, 8, 14–16.

**181.** *See supra* Part II.A.3(v).

#### (vi) Defendants' Bad Faith

Plaintiff has shown to this Court's satisfaction that defendants altered an invoice and concocted a fictional account of the creation of the SN–6806.[182] The altered invoice and the discredited explanation for the similarities between the SN–6806 and the CKT–686 indicate that defendants have acted in bad faith, at least during the litigation of this case.

On the other hand, it should be noted that defendants secured a patent for their product and openly marketed it in spite of warnings by plaintiff that they were infringing the '465 patent. This indicates that defendants felt they were acting within their rights, and tends to belie a finding of bad faith on their part.

The Court finds the evidence inconclusive with regard to defendants' bad faith intent to confuse consumers. As a result, this factor will be given little weight in the likelihood of confusion analysis.

#### (vii) Quality of Defendants' Product

Plaintiff submitted testimony that defendants' phones are of a much lower quality than its own, that they are known in the industry as such, that defendants' phones are difficult to program, and that they have repeatedly had mechanical problems.[183]

The Court is unable to make a finding as to the quality of the phones. Plaintiff's testimony is uncontested, but also completely unsubstantiated. As such, the Court does not give it great weight.

#### (viii) Sophistication of Consumers

The parties have not submitted evidence bearing directly on a determination of the sophistication of their consumers. Once again, the Court notes that typical consumers are probably infrequent purchasers without a specialized knowledge of the table top pay phone field, but recognizes also that the use of sales catalogs greatly decreases the risk of consumer confusion as to the products' source.[184]

#### 3. Balance of the Factors

■ The weakness of plaintiff's trade dress and the Court's finding that the products are not particularly similar leads to the conclusion that there is no likelihood of confusion between plaintiff's and defendants' products based on their design. The two phones are somewhat similar, but not enough to merit finding in favor of plaintiff in light of the indeterminacy of the other *Polaroid* factors. On balance, therefore, the Court finds no likelihood of confusion between plaintiff's and defendants' products. This makes it unnecessary for the Court to proceed to a determination of whether the defendants acted in bad faith. Plaintiff's claim for unfair competition arising from defendants' imitation of its product fails due to plaintiff's inability to make the requisite showing of confusion.

#### V.

#### Deceptive Acts and Practices

New York's General Business Law provides a cause of action to any person injured by another's deceptive acts or practices in the conduct of business.

The relevant portion of the statute provides:

"(a) Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.

. . .

---

182. See *supra* notes 18–23 and accompanying text.

183. PX 52 (Harap) ¶¶ 20, 21; *see also* PX 50 (Judy Chien) ¶ 92; PX 49 (Jimmy Chien) ¶ 92.

184. See *Landscape Forms, Inc. v. Columbia Cascade Co.,* 113 F.3d 373, 376 (2d Cir.1997) (citing sales through catalogs that identify the manufacturer as factor favoring defendant in trade dress suit).

(h) In addition to the right of action granted to the attorney general pursuant to this section, any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff." [185]

■ General Business Law Section 349 is a consumer protection statute, and requires a finding of intentional deception of consumers in order for plaintiff to prevail.[186] Plaintiff claims that defendants' misappropriation and infringement represent a deliberate attempt to mislead and deceive consumers into believing that defendants' products originate with or are sanctioned by plaintiff.[187] Plaintiff, however, has not submitted persuasive evidence of defendants' deceptive intent. This is true even with regard to the misappropriation of plaintiff's photographs, which plaintiff has proven that Tang copied. Eastern has not demonstrated that Tang copied the photographs with the intent to deceive consumers, as opposed simply to saving itself the time and costs involved in creating its own advertising photographs.

Without a showing of this essential element, plaintiff's claim of deceptive business practices arising from the imitation or misappropriation of plaintiff's product design, trade dress, and photographs must fail.

## VI.

### Dilution

Eastern's sixth cause of action is for dilution of the distinctive quality of its products and trade dress in violation of Section 360-*l* of New York's General Business Law.[188]

That section provides:

"Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services." [189]

■ Dilution is based on the idea that the value of a mark to clearly and unmistakably distinguish one source should not be whittled away through an unauthorized use.[190] To establish a dilution claim a plaintiff must show (1) ownership of a distinctive mark, and (2) a likelihood of dilution.[191] The predatory intent of the junior user is also a relevant factor in assessing a claim of dilution, since relief under the statute is of equitable origin.[192]

---

**185.** N.Y. GEN. BUS. LAW § 349 (McKinney 1988).

**186.** See *Samara Bros., Inc. v. Wal-Mart Stores, Inc.*, 165 F.3d 120, 131 (2d Cir.1998), *rev'd on other grounds*, —— U.S. ——, 120 S.Ct. 1339, —— L.Ed.2d —— (2000).

**187.** Cpt. ¶ 82.

**188.** N.Y. GEN. BUS. LAW § 360-*l* (McKinney 1999).

**189.** *Id.*

**190.** See *Hormel Foods Corp. v. Jim Henson Productions, Inc.*, 73 F.3d 497, 506 (2d Cir. 1996) (citing 3 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 24.13[1][a] at 24–106 (3d ed.1995)); *Regal Jewelry Co. v. Kingsbridge Int'l, Inc.*, 999 F.Supp. 477, 493 (S.D.N.Y. 1998); *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (1977).

**191.** *Hormel Foods Corp.*, 73 F.3d at 506.

**192.** *Sally Gee, Inc. v. Myra Hogan, Inc.*, 699 F.2d 621, 626 (2d Cir.1983).

## A. Ownership of a Distinctive Mark

The Second Circuit has found that "[d]istinctiveness for dilution purposes often has been equated with the strength of a mark for infringement purposes." [193] The Court previously found plaintiff's packaging trade dress distinctive. It did not make such a determination with regard to plaintiff's product configuration trade dress but proceeds to that analysis here.

### 1. Distinctiveness of Plaintiff's Product Configuration

■ Eastern asserts that the total design and appearance of the SN–6806 is distinctive, and identifies the following elements as contributing to its distinctiveness: (1) a two-tone color combination, (2) a curved upper body, (3) oval keypad keys, (4) a "foldover" faceplate (which the Court has referred to as in inset faceplate), (5) an oval recess around a round talk button, and (6) a curved design on the front face of the phone.[194]

The Court finds the combination of these elements to be novel but not source-identifying and therefore not distinctive. The primary purpose of each of the elements articulated is aesthetics rather than source identification.[195] Plaintiff's two-tone color combination could be indicative of the product's source if it had attained a secondary meaning in the marketplace,[196] but plaintiff has not proven this to be the case. In fact, the same two-tone combination articulated by plaintiff, particularly the use of gray as a base color, can be seen in CCKT's previous models.[197] Similarly, a curved body appears in the prior art cited in plaintiff's design patent application, making it an unlikely source-identifying element.[198] Thus, the Court does not find that Eastern's product design is likely to be understood as an indicator of its source. In other words, it is not distinctive.

## B. Likelihood of Dilution

Because plaintiff has not satisfied the first element of dilution, distinctiveness, with regard to product configuration, and any claim arising from infringement of its design patent is preempted by federal patent law,[199] the Court will proceed to determine whether plaintiff has shown a likelihood of dilution of its packaging trade dress only. To do so plaintiff must show either the blurring of its product identification or the tarnishing of an affirmative association that its mark has come to convey.[200]

193. *Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026, 1030 (2d Cir.1989) (citing *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538, 545, 399 N.Y.S.2d 628, 632, 369 N.E.2d 1162 (1977)).

194. PTO ¶¶ 81, 83 (Plaintiff's Contentions).

195. *See, e.g., Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1009 (2d Cir.1995) (finding sweater designs primarily aesthetic and therefore not protectable as trade dress).

196. *See Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 163, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995); *see also Forschner Group, Inc. v. Arrow Trading Co.*, 124 F.3d 402, 408 (2d Cir.1997) ("As an element of trade dress ... we observe that color is never inherently distinctive, but is capable of identifying a product's source ... only when it has attained secondary meaning....").

197. *See, e.g.*, DX 1A, 1C.

198. *See* PX 40.

199. The Supreme Court has held that "state regulation of intellectual property must yield to the extent that it clashes with the balance struck by congress in our patent laws." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 152, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989). To the extent that New York's antidilution statute is designed to prevent defendants from making, using, or selling phone designs that allegedly mimic Eastern's design, it promotes the same goals as the federal patent scheme and must yield to the national interest in uniform patent law. *See Escada AG v. The Limited, Inc.*, 810 F.Supp. 571, 574 (S.D.N.Y.1993).

200. *Mead Data Cent.*, 875 F.2d at 1030 (citing *Sally Gee, Inc.*, 699 F.2d at 625).

## 1. Blurring

Blurring occurs when a defendant uses or modifies the plaintiff's mark to identify the defendant's goods, thereby increasing the possibility that the mark will lose its ability to serve as a unique identifier of plaintiff's product.[201] "Injury to the mark's selling power need not involve any confusion as to source or sponsorship."[202] In fact, a cause of action for trademark dilution is meant to cover situations in which the public knows the defendant is not affiliated with plaintiff, but its association of the mark with defendant weakens plaintiff's unique identifier.[203] Plaintiff is not required, therefore, to prove likelihood of confusion in order to prevail on this claim.

The Second Circuit recently has expanded the traditional six-factor test for a likelihood of blurring to ten factors that should be considered in assessing claims of dilution.[204] The ten factors are as follows: (1) the distinctiveness of the senior mark, (2) the similarity of the marks, (3) the proximity of the products and likelihood of bridging the gap, (4) the close interdependent relationship among the three preceding factors, (5) the extent of overlap among consumers of the senior and junior users' products, (6) the sophistication of the consumers, (7) whether there is actual confusion, (8) whether the senior user's mark is in fact descriptive of the junior use, (9) whether the senior user acted with reasonable promptness in seeking to protect its mark from the alleged dilution, and (10) whether the senior user has been lax in the past in taking steps to protect is mark against dilution by others.[205]

Of the ten factors, those weighing in favor of plaintiff are its reasonably distinct mark, the fact that the products are in very close proximity, some (relatively unpersuasive) evidence of actual confusion, and plaintiff's prompt action to protect its mark. The Court has found the evidence indeterminate with regard to the sophistication of consumers, and there is no evidence of the extent of overlap among consumers, whether plaintiff's mark is descriptive of defendants' use, or whether plaintiff has been lax in protecting its mark in the past. The factor weighing most heavily against a finding of dilution based on the parties' packaging trade dress is the similarity of the marks. As the Court explained when considering plaintiff's trade dress infringement claim, it does not find the parties' packaging overly similar. This makes it difficult to justify a finding that defendants' packaging could be dilutive of plaintiff's trade dress.

This conclusion is bolstered by reference to the traditional six factor test;[206] of the six, only the similarity of the products weighs in favor of a finding of dilution. The marks are not similar, the sophistication of consumers bears little weight, plaintiff has not shown a predatory intent on the part of defendants, and, with the exception of assertions by both parties that their marks are well-known and respected, the renown of both the senior and junior marks is unproven.

Thus, considering the new ten-factor test as well as the six traditional factors, the Court finds that plaintiff has not prov-

**201.** *See Federal Express Corp. v. Federal Espresso, Inc.,* 201 F.3d 168, 175 (2d Cir. 2000) (citations omitted).

**202.** *Hormel Foods Corp.,* 73 F.3d at 506.

**203.** *See Sports Authority, Inc. v. Prime Hospitality Corp.,* 89 F.3d 955, 965–66 (2d Cir. 1996).

**204.** *Federal Express Corp.,* 201 F.3d at 175–77. The six original factors were: (1) similar-

ity of the marks, (2) similarity of the products covered, (3) sophistication of the consumers, (4) predatory intent, (5) renown of the senior mark, and (6) renown of the junior mark. *See Mead Data Cent.,* 875 F.2d at 1035–40 (Sweet, J., concurring); *Sports Authority, Inc.,* 89 F.3d at 966 (citations omitted).

**205.** *Federal Express Corp.,* 201 F.3d at 175–77.

**206.** *See supra* note 203.

en that blurring of its trade dress has occurred.

### 2. *Tarnishment*

 Tarnishment "generally arises when the plaintiff's trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context likely to evoke unflattering thoughts about the owner's product." [207] The essence of tarnishment is not necessarily dilution of a mark, as it is with blurring, but rather the "displacement of positive with negative associations of the mark ... that reduces the value of the mark to its owner." [208]

Plaintiff has submitted testimony that the poor quality and similarity in appearance of defendants' phones has "tarnished and continues to tarnish Eastern's reputation for not only its telephones, but for its general product line." [209] The Court finds this to be a somewhat unlikely exaggeration, particularly with regard to the parties' packaging trade dress. The Court concludes that the trade dress at issue is not sufficiently similar to dilute Eastern's trade dress, either by blurring its marks or by tarnishing its reputation. As a result, plaintiff's claims for violation of New York General Business Law Section 360–*l* are without merit.

### *Conclusion*

For the foregoing reasons, plaintiff is entitled to judgment against Tang as follows:

1. Awarding statutory damages in the amount of $25,000.

2. Enjoining Tang from further infringing plaintiff's copyrighted photographs and ordering Tang to deliver up for destruction all remaining copies of the offending catalogs.

3. Awarding to plaintiff reasonable attorney's fees in respect to its copyright infringement claim as determined on timely motion together with the costs of this action.

The complaint is dismissed in all other respects as against Tang and Digital Import. The complaint is dismissed without prejudice as to CCKT pursuant to Rule 4(m) because it was not served in this action. The counterclaim is dismissed as frivolous.

SO ORDERED.

---

**207.** *Deere & Co. v. MTD Products, Inc.,* 41 F.3d 39, 43 (2d Cir.1994).

**208.** *New York Stock Exchange, Inc. v. New York, New York Hotel, LLC,* 69 F.Supp.2d 479, 491 (S.D.N.Y.1999).

**209.** PX 52 (Harap) ¶ 28.