**SHL IMAGING, INC., Plaintiff,**

v.

**ARTISAN HOUSE, INC., Max Munn, Interiors, Inc., and Photo–2–Art, Ltd., Defendants.**

**No. 98 CIV. 1708(WHP).**

United States District Court, S.D. New York.

Sept. 28, 2000.

---

Todd Blecher, New York, NY, for Plaintiff.

Alfred R. Fabricant, Ostrolenk, Faber, Gerb & Soffen, LLP, New York, NY, for Defendants.

## MEMORANDUM AND ORDER

PAULEY, District Judge.

This copyright action raises issues concerning the copyrightability of photographs, the work-for-hire doctrine, joint authorship, and the nature of derivative works. Plaintiff SHL Imaging, Inc. ("SHL") is owned by professional photographer Steven H. Lindner ("Lindner"). Lindner's work has been published in The New York Times and Sports Illustrated. (Lindner Aff. ¶ 6.) The defendant Max Munn ("Munn") is chairman and CEO of defendants Artisan House, Inc. ("Artisan") and Interiors, Inc. ("Interiors"). The defendants design, manufacture and sell frames for pictures and mirrors.[1] (Munn Aff. ¶ 3.)

In 1996, Munn hired Lindner to photograph mirrored picture frames manufactured and offered for sale by defendants. Lindner photographed approximately 130 different frames with the understanding that the photographs would be used as color slides by defendants' sales force. Thereafter, Munn used the photographs in a catalogue, reproduced them in 5,000 brochures, and offered them as magazine "comps" or publicity releases. Defendants also provided Lindner's photographs to Photo–2–Art, Ltd. so they could be scanned into a computer for manipulation and displayed to customers.

Defendants move for summary judgment on plaintiff's copyright claims[2] on the grounds that the photographs are not original, or alternatively, if they are, that defendants were either joint authors or the sole work-for-hire author. On July 20, 2000, this Court notified the parties that it was considering a grant of summary judgment to plaintiff and afforded defendants the opportunity to make additional arguments or submit additional evidence. Thereafter, defendants submitted a supplemental memorandum.

For the reasons that follow, defendants' motion for summary judgment is denied, and this Court grants summary judgment to plaintiff on the issue of liability under the Copyright Act, 17 U.S.C. § 101, *et seq.* At the outset, this Court observes that its *sua sponte* grant of summary judgment rests on an analysis of issues raised by the defendants in their motion and supplemental submission. Thus, the defendants have not been prejudiced by a lack of notice or any inability to offer evidence. *See Bridgeway Corp. v. Citibank,* 201 F.3d 134, 140 (2d Cir.2000).

## BACKGROUND

Prior to photographing the frames, Lindner made a number of creative decisions including selection of a camera (a handcrafted Hasselblad 500 EL), lenses (Zeiss 50mm and 80 mm), film type (C–Print negative Fuji ASA 160), paper type (seamless), as well as diffusers, reflectors, and lighting equipment. (Lindner Aff. ¶ 13.) Lindner supplied all of the photographic equipment for the project. (Lindner Aff. ¶ 12.)

The photo shoot spanned four days at Interior's factory. (Lindner Aff. ¶ 4.) Assisted by his employee Ersellia Ferron ("Ferron"), Lindner arranged both the lighting and staging of the frames. In-

---

1. Photo–2–Art, Ltd. has not been served with a summons and has not appeared, therefore all claims against it are dismissed.

2. The motion is really one for partial summary judgment since defendants did not address plaintiff's state law contract claims.

stead of using "copy lighting" (two lights set up at 45 degree angles in front of the object being photographed), Lindner selected a single light source with a reflector in order to "fill out the shadows (but not eliminate them) to give a chiaroscuro effect that would wrap around the [frame] and give it depth." (Lindner Aff. ¶ 17.) While Munn asserts that he "instructed Lindner precisely how [he] wanted the photographs taken, including the positioning and angle and appropriate lighting," he provides no specifics. (Munn Aff. ¶ 12.) Lindner and Ferron alone set up the lighting, hung the frames and took the photographs, while Munn remained in his office. (Lindner Aff. ¶ 13; Ferron Dep. at 16.)

Photographing the frames was complicated by the reflection in the mirrors of several frames. (Lindner Aff. ¶ 17.) Lindner overcame this obstacle by creating a unique lighting design so that the mirrors would not reflect any part of the factory or the photographer. (Lindner Aff. ¶ 17.) The lighting design also enhanced the luster of each frame's gilt. (Lindner Aff. ¶ 17.) As the shoot proceeded, Lindner also took Polaroid instant photographs "to check [the] lighting, angles and composition." (Lindner Aff. ¶ 12.) Munn claims that he ordered the Polaroids to ensure Lindner was following his instructions. (Munn Reply Aff. ¶ 12.)

After the shoot concluded, plaintiff submitted a preliminary invoice to Munn, who rejected it. Thereafter, plaintiff submitted a second bill in the amount of $3,700, which was paid. (Lindner Aff. Ex. 2: 11/19/96 Invoice.) That bill bears Munn's initials and the remark "OK" on its first page. (Lindner Aff. ¶ 20 & Ex. 2: 11/19/96 Invoice.) The invoice specifies: "Re: Photography of frames. Usage: For C–Prints to be used by sales people." "C–Prints" is shorthand for negative color prints. (Lindner Aff. ¶ 7.)

Five months later, Lindner discovered that Artisan had used sixty-four of the photographs in a catalogue without securing his permission. After registering the photographs with the Copyright Office, plaintiff filed this infringement action. (Lindner Aff. ¶ 9.) During discovery, defendants revealed that they had made an additional 3,000 copies of the photographs for undisclosed purposes, reproduced them in 5,000 brochures, scanned eighty-three of them into a computer, and used the photographs as magazine "comps" or publicity releases, all without plaintiff's permission. (Lindner Aff. ¶ 10.)

## DISCUSSION

### I. Summary Judgment Standards

Summary judgment may be granted only when there is no genuine issue of material fact remaining for trial, and the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c). The burden of demonstrating the absence of any genuine dispute as to a material fact rests with the moving party. See Grady v. Affiliated Cent., Inc., 130 F.3d 553, 559 (2d Cir.1997). In determining whether the movant has met this burden, the Court must resolve all ambiguities and draw all permissible factual inferences in favor of the party opposing the motion. See Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1187 (2d Cir.1987).

If the moving party meets its initial burden, the non-moving party must then come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The non-moving party must "do more than simply show there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). Where it is apparent that no rational finder of fact "could find in favor of the non-moving party because the evidence to support its case is so slight," summary judgment should be granted. Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1223 (2d Cir.1994).

It is well established that courts may grant summary judgment sua sponte when

no material issue of fact is in dispute and the losing party was on notice that it had to come forward with all of its evidence. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986) ("district courts are widely acknowledged to possess the power to enter summary judgments *sua sponte* "); *Bridgeway Corp.,* 201 F.3d at 139 ("District courts are well advised to give clear and express notice before granting summary judgement *sua sponte,* even against parties who have themselves moved for summary judgment."). This Court notified defendants that it was considering a grant of summary judgment for plaintiff on liability and afforded defendants additional time to submit further arguments or evidence. Accordingly, the absence of a motion by plaintiff is inconsequential. *See Bridgeway,* 201 F.3d at 139.

## II. *Prima Facie Case of Infringement*

■ Plaintiff claims that defendants infringed its copyrights in the photographs. The Copyright Act does not define "infringement," but rather states in conclusory fashion that "anyone who violates one of the exclusive rights of the copyright owner . . . is an infringer of copyright." 17 U.S.C. § 501(a)(1996). Congress left the courts free to flesh out the outlines of a cause of action. Fundamentally, the elements required to establish a prima facie case of copyright infringement are: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Telephone Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 1296, 113 L.Ed.2d 358 (1991).

■ Plaintiff obtained a certificate of registration from the Copyright Office within five years from the date of the photographs' publication. (Lindner Aff. Ex. 2: Registration No. VA 855–059.) Under 17 U.S.C. § 410(c), the certificate constitutes prima facie evidence of the facts stated therein and of the originality of the work. Here the certificate states that

plaintiff is the sole author of the photographs, and therefore, the owner of the copyrights. Defendants bear the burden of overcoming this statutory presumption. *See Langman Fabrics v. Graff Californiawear, Inc.,* 160 F.3d 106, 111 (2d Cir. 1998) (noting that "[t]he statutory presumption is by no means irrebutable, but it does order the burden of proof").

## III. *Derivative Works*

■ In evaluating whether plaintiff has established ownership of a valid copyright, defendants argue that plaintiff's photographs are derivative works that must satisfy a higher standard of "substantial originality." (*See* Defs.' Reply Br. at 5–11.) The nub of defendants' argument is that the photographs are derivative works because they depict the defendants' frames. (*See, e.g.,* Defs.' Br. at 4–13; Defs.' Reply at 1–9.)

The Copyright Act defines a derivative work as

> a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work".

17 U.S.C. § 101. Thus, a derivative work must incorporate a substantial element of a preexisting work of authorship and recast, transform, or adapt those elements.

■ Recently, the Ninth Circuit addressed the question of whether a photograph is a derivative work of the object it depicts. *See Ets–Hokin v. Skyy Spirits, Inc.,* 225 F.3d 1068, 1077–1082 (9th Cir. 2000). Although the Ninth Circuit concluded that a photograph of a vodka bottle was not a derivative work of the bottle, it reached that holding only after determin-

ing that the bottle was not independently copyrightable. Thus, the Ninth Circuit reasoned that the bottle was not a preexisting work. *Ets–Hokin*, at 1077–1082. This Court respectfully believes that the *Ets–Hokin* court misconstrued the nature of derivative works. While the *Ets–Hokin* court correctly noted that a derivative work must be based on a "preexisting work," and that the term "work" refers to a "work of authorship" as set forth in 17 U.S.C. § 102(a), it failed to appreciate that any derivative work must recast, transform or adopt the authorship contained in the preexisting work. A photograph of Jeff Koons' "Puppy" sculpture in Manhattan's Rockefeller Center, merely depicts that sculpture; it does not recast, transform, or adapt Koons' sculptural authorship. In short, the authorship of the photographic work is entirely different and separate from the authorship of the sculpture.

This is not to suggest that photographs are incapable of derivative authorship. A cropped photograph of an earlier photograph is a derivative work. Re-shooting an earlier photographic work with some alteration of the expressive elements is another example. However, in both cases the nature of photographic authorship would have been recast, adapted, or transformed. Since plaintiff's photographs merely depict defendants' frames and do not recast, adapt or transform any authorship that may exist in the frames, they are not derivative works.

## IV. *Originality*

Since the photographs are not derivative works, the next issue is whether they satisfy the general constitutional requirement of originality. Defendants assert they do not. Before addressing defendants' arguments, it is useful to review the nature of copyright in photographs so that those general principles can be applied to this claim.

Photographs did not receive federal copyright protection until the Act of March 3, 1865, 38th Cong., 2d Sess., 16 Stat. 198. *See also* Cong. Globe 981 (Feb. 22, 1865); William Patry, 1 *Copyright Law & Practice* 248–253 (1994) [hereinafter "Patry"]. However, photography had become an established commercial endeavor as early as 1839, when the French government made the daguerreotype process available and William Talbot produced negative images on paper through a process called, eponymously, "Talbottype." *See* Naomi Rosenblum, *A History of Women Photographers* 42 (1994) [hereinafter "*A History of Women Photographers*"]; Naomi Rosenblum, *A World History of Photography* 47 (3d ed.1997) [hereinafter "*A World History of Photography*"]. The following year, Alexander Wolcott and John Johnson established the first commercial photography studio in the United States here in New York City. Four years later, Mathew Brady, whose subsequent photographs of the Civil War would gain world wide recognition, established his studio in lower Manhattan. *See A World History of Photography* at 47. By the 1850s, small cartes-devisite photographs were exchanged with all the passion baseball cards would be traded a century later. Even Queen Victoria is reported to have collected more than one hundred albums of photographs of European royalty. *See A World History of Photography* at 64.

The reason for the delay in extending federal copyright protection for photographs will likely never be known, but the increased post-Civil War commercial popularity of portraiture photography by leading figures such as Mathew Brady, Napoleon Sarony, and Julia Margaret Cameron may have led to widespread piracy, and, therefore, calls for protection.

Even though photography had been poetically referred to as "drawing with the aid of the sun,"

[i]t was not yet clear whether photography could produce art or merely a record, whether it would be just a pastime or could fulfill more serious purposes, whether it was limited by its current

technology or could be expanded in unforeseen ways. But from the start photography was perceived to be a different kind of picture making—an easier version of an activity [painting] that had required a degree of talent and training not available to many.

*A World History of Photography* at 39.

Painters, like many faced with the introduction of a new technology, feared the end of public interest in their art. Critics derided photography, declaring that the new medium "copies everything and explains nothing, it is blind to the realm of the spirit." *A World History of Photography* at 210. Yet, some photographers' skill inspired high praise. Critic Phillipe Burty, reviewing an 1859 exhibition of photography by Gaspard Felix Tournachon (a/k/a Nadar), wrote, "his portraits are works of art in every accepted sense of the word.... [I]f photography is by no means a complete art, the photographer always has the right to be an artist." *A World History of Photography* at 72.

In the United States, some photographers quickly seized on the new medium as a means to express artistic as well as political and social sentiments. *See* Margaret Loke, *In a John Brown Portrait, The Essence of a Militant,* N.Y. Times, July 7, 2000, at E30 (describing a striking 1846 photograph of abolitionist John Brown by African–American photographer Augustus Washington, who touted his artistic skill and his intention of using that skill to contribute to the advancement of "the oppressed and unfortunate people with whom I am identified").

The ambivalence and occasional antagonism toward photography expressed by painters and art critics spilled into the debate over whether to extend copyright protection to photographs. It was not until 1948 that the Berne Convention for the Protection of Literary and Artistic Works enumerated photographs as a mandatory subject matter. Prior to that revision, protection was either on a reciprocal basis or extended only to "artistic," as opposed

to "ordinary" photographs. *See* Patry at 254. Even for "artistic" photographs, a minimum term of protection of twenty-five years from the making of the photographic work was not required until the 1971 Paris Text of the Berne Convention. *See* Berne Convention for the Protection of Literary and Artistic Works, July 24, 1971, art. 7(4) (Paris text 1971); Patry 253–254. The Universal Copyright Convention still does not require protection for photographs. *See* Universal Copyright Convention, July 24, 1971, art. IV(3) (Paris text 1971). Article 12 of the Trade–Related Aspects of Intellectual Property Rights Agreement (part of the 1994 Uruguay Round of the General Agreement on Tariffs and Trade), allows member countries to exclude photographs from the general requirement of a term of protection of life of the author plus 50 years. *See* Agreement on Trade–Related Aspects of Intellectual Property Rights, Including Trade in Counterfeit Goods, MTN/FA II–A1C (1994). Only recently has international protection for photographs taken a significant step forward: Article 9 of the 1998 World Intellectual Property Organization Copyright Treaty forbids signatories from applying the Berne Convention's Article 7(4). *See* WIPO Copyright Treaty, CRNR/DC/94 (1998). The effect is to extend the protection for photographs to the life of the author plus 50 years.

The dual standard applied by the Berne Convention—"artistic" photographs could be protected, but "ordinary" photographs could not—stemmed from doubts over whether photographs were the result of the photographer's creativity or were instead the result of the technical process of photography. Those doubts took on constitutional dimensions in a challenge to the Act of March 3, 1865 in *Burrow–Giles Lithographic Co. v. Sarony,* 111 U.S. 53, 4 S.Ct. 279, 28 L.Ed. 349 (1884). In *Burrow–Giles,* plaintiff Napoleon Sarony was a successful celebrity photographer who produced inexpensive cartes-de-visite and larger cabinet cards favored by actors as

publicity shots. *See In The Waking Dream: Photography's First Century* 339–40 (M. Hambourg, *et al.* eds., Metropolitan Museum of Art 1993). In 1882, twenty-seven-year-old Oscar Wilde came to the United States at the invitation of theater producer Richard D'Oyle Carte as part of the production of Gilbert & Sullivan's operetta "Patience," satirizing Wilde's "aesthetics" movement. Eager to be in the limelight, Wilde sought out Sarony for a series of publicity photographs to use on his tour of the United States:

> Wilde appeared in Sarony's studio dressed in the attire he would wear at his lectures: a jacket and vest of velvet, silk knee breeches and stockings, and slippers adorned with grosgrain bows— the costume he wore as a member of the Apollo Lodge, a Freemason society at Oxford. Sarony took many photographs of Wilde, in a variety of poses. Here, his features not yet bloated by self-indulgence and high living, Wilde leans forward toward the viewer as though engaging him in dialogue, the appearance and calculated pose of the dandy secondary to the intelligence and spontaneous charm of conversation.

*In The Waking Dream: Photography's First Century* at 339–340.

In all, Sarony took more than twenty photographs of Wilde and registered them with the Copyright Office. Defendant Burrow–Giles, a lithographer, sold a staggering 85,000 copies of one of Sarony's photographs, "Oscar Wilde No. 18," without Sarony's permission. *See Burrow–Giles*, 111 U.S. at 54, 4 S.Ct. at 279. Because substantial similarity was not an issue, Burrow–Giles mounted a direct constitutional attack on Congress's authority to protect any photograph. Burrow–Giles asserted that "writings" under the Constitution were limited to literary productions and that photographs did not involve authorship since they were the result of a mechanical process. *See Burrow–Giles*, 111 U.S. at 55, 4 S.Ct. at 280. Only the latter argument is relevant to this case.

Burrow–Giles argued that photographs were "the mere mechanical reproduction of the physical features or outlines of some object, animate or inanimate, and involve[ ] no originality of thought or any novelty in the intellectual operation connected with its visible reproduction in [the] shape of a picture." *Burrow–Giles*, 111 U.S. at 59, 4 S.Ct. at 281. Once the image was captured on the photographic plate, the resulting photograph followed mechanically and inevitably. The Supreme Court did not reject Burrow–Giles' attack entirely, observing that a lack of originality may be "true in regard to the ordinary production of a photograph .... [I]n such a case a copyright is no protection." *Burrow–Giles*, 111 U.S. at 59, 4 S.Ct. at 282. However, the Court found that Sarony's "Oscar Wilde No. 18" was no "ordinary" photograph and that Sarony was an author based on the trial court's findings that the photograph was a

> new, harmonious ... and graceful picture, ... that plaintiff made ... entirely from his own mental conception, to which he gave visible form by posing the said Oscar Wilde in front of the camera, selecting and arranging the costume, draperies, and other various accessories in said photograph, arranging the subject so as to present graceful outlines, arranging and disposing the light and shade, suggesting and evoking the desired expression, and from such disposition, arrangement, or representation, made entirely by plaintiff, he produced the picture in suit.

*Burrow–Giles*, 111 U.S. at 60, 4 S.Ct. at 282.

Two general principles emerge from *Burrow–Giles*. First, an author is someone who creates the work himself, *i.e.*, does not copy it from someone else. Second, an author must imbue the work with a visible form that results from creative choices. In the case of Oscar Wilde No. 18, these creative choices included the particular pose (the unique features of which are recounted above in the quotation from

the Hambourg book), selecting and arranging the costume, draperies, and other "accessories," as well as the lighting and shading. The combination of these choices was a "new, harmonious, and graceful picture," subject to protection. *Burrow–Giles*, 111 U.S. at 60, 4 S.Ct. at 282.

Nineteen years later, the Supreme Court renounced the distinction between the artistic and the ordinary in *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 23 S.Ct. 298, 47 L.Ed. 460 (1903). In describing the circumstances when the requisite creativity may be satisfied, Justice Holmes wrote:

> The [work] is always the personal reaction of an individual upon nature. Personality always contains something unique. It expresses its singularity even in handwriting, and a very modest grade of art has in it something irreducible, which is one man's alone. That something he may copyright unless there is a restriction in the words of the act.

*Bleistein*, 188 U.S. at 250, 23 S.Ct. at 300.

Despite the broad sweep of this paragraph, Justice Holmes was not suggesting that a mere signature, even one as distinctive as John Hancock's, is by itself copyrightable, nor that all pictorial works are *per se* protectible. Rather, he noted that courts may reject protection for works within "the narrowest and most obvious limits" and that works are protectible when there is a "very modest grade of art." *Bleistein*, 188 U.S. at 250, 251, 23 S.Ct. at 300.

The Supreme Court's most recent and authoritative pronouncement on originality in *Feist* augmented the *Bleistein* analysis. In *Feist*, the Court rejected the proposition that works are protectible so long as they were born from "sweat of the brow," reaffirming that "[o]riginality is a constitutional requirement." 499 U.S. at 346–47, 351–52, 358, 111 S.Ct. at 1288, 1290–91, 1294. The Court also cautioned that it is not difficult to satisfy the originality requirement; an author need only independently create the work and imbue it with "some minimum level of creativity," a "creative spark." *Feist*, 499 U.S. at 345, 358, 111 S.Ct. at 1290, 1294. The "spark need not provide a shock, but it must at least be perceptible to the touch." Patry at 149.

The standards to be applied in determining whether the creative spark is present can be elusive. Although photography is a species of pictorial work, *see* 17 U.S.C. §§ 102(a)(5), 101 (definition of "pictorial, graphic and sculptural works"), it is not defined in the Copyright Act. Thus, unlike computer programs and audiovisual works, which are defined in the Act, courts are left without congressional guidance as to what attributes of photographic works are necessary to satisfy the originality requirement.

Judge Learned Hand observed that "no photograph, however simple, can be unaffected by the personal influence of the author, and no two will be absolutely alike." *Jewelers' Circular Publ'g Co. v. Key–Stone Publ'g Co.*, 274 F. 932, 934 (S.D.N.Y.1921), *aff'd*, 281 F. 83 (2d Cir. 1922). Although often quoted, this statement should not be read as a comment that all photographs are *per se* copyrightable. The Supreme Court in *Feist* made clear that the originality requirement is constitutional, and that no work is *per se* protectible.

There is no uniform test to determine the copyrightability of photographs. *See, e.g., Burrow–Giles*, 111 U.S. at 60, 4 S.Ct. at 282 (considering pose, selection and arrangement of costumes, draperies and other accessories, lighting and shading); *Rogers v. Koons*, 960 F.2d 301, 307 (2d Cir. 1992) (emphasizing photographer's "inventive efforts" in posing couple holding improbably numerous puppies between them, and photographic printing); *Gross v. Seligman*, 212 F. 930, 931 (2d Cir.1914) (considering pose, background, light, and shade); *Eastern Am. Trio Prods., Inc. v. Tang Elec. Corp.*, 97 F.Supp.2d 395, 417–18

(S.D.N.Y.2000) (considering "lay-out", angles, lighting, and computer enhancements); *Kisch v. Ammirati & Puris,* 657 F.Supp. 380, 382 (S.D.N.Y.1987) (considering selection of lighting, shading, positioning, and timing).

The difficulty in identifying a common set of protectible elements may be attributable to the 19th century prejudice against the creation of works by mechanical means. This prejudice is rooted in unfounded suspicion that photographic equipment restricts creativity. *See* Patry at 252 ("As with other works created by technological means, protection for photographs has been hampered by superficial examination of the wide range of creative options available to the photographers.")

The technical aspects of photography imbue the medium with almost limitless creative potential. For instance, the selection of a camera format governs the film size and ultimately the clarity of the negative. Lenses affect the perspective. Film can produce an array of visual effects. Selection of a fast shutter speed freezes motion while a slow speed blurs it. Filters alter color, brightness, focus and reflection. Even the strength of the developing solution can alter the grain of the negative.

The elements that combine to satisfy *Feist*'s minimal "spark of creativity" standard will necessarily vary depending on the photographer's creative choices. The cumulative impact of these technical and artistic choices becomes manifest in renowned portraits, such as "Oscar Wilde 18." The measure of originality becomes more difficult to gauge as one moves from sublime expression to simple reproduction.[3]

■ Originality analysis in this case begins with Lindner's description of his creative process. Lindner carefully chose to use single light source with a "reflector to fill out the shadows" in order to "give a chiaroscuro effect that would wrap around the [the frames] and give [them] depth." (Lindner Aff. ¶ 15.) He used this lighting technique because "copy lighting" would "wash out the shadows and impart a flat look." (Lindner Aff. ¶ 15.) Lindner also employed artistic judgment in determining the amount of shadowing for each individual frame that would emphasize the detail without obscuring it. (Lindner ¶ 15.) Reflections in the mirrors also complicated the shoot and led to the creation of a "unique light design on a reflector that would appear in the mirror without showing any part of the room or [himself] in the mirror." (Lindner Aff. ¶ 16.)

The digital reprints in defendants' catalogue support Lindner's assertion that he exercised significant aesthetic judgment. They show the detail in the carvings, the saturation of color and gilt, and the appearance of attractive and well-defined picture frames.

The affidavits by defendants' photography experts do not rebut plaintiff's substantial evidence concerning originality. Those affidavits declare that "there is nothing unusual in the camera Mr. Lindner used or in the film or exposure ..." and that "the photographs reflect effort by Mr. Lindner, but certainly ... no substantial originality in the manner in which they

3. Courts often cite *Time, Inc. v. Bernard Geis Assocs.,* 293 F.Supp. 130 (S.D.N.Y.1968), involving the·Zapruder film of President Kennedy's assassination, for the proposition that even newsworthy photographs taken by sheer happenstance are copyrightable. However, the Zapruder case was decided before *Feist.* More importantly, the Zapruader case involved the infringement of an audiovisual work by a·photograph. The issue before the court was whether the film of Kennedy's assassination was copyrightable. The copy-rightability of an audiovisual work is analyzed in accord with the definition of audiovisual works in the Copyright Act. *See Atari Games Corp. v. Oman,* 979 F.2d 242, 244–45 (D.C.Cir.1992) (Ruth Bader Ginsburg, J.). This analysis is not altered by the fact that the audiovisual work is alleged to have been infringed by copying individual frames. Thus, the Zapruder case is not a proper point of reference in determining the copyrightability of a photograph.

were taken or in the result." (Weiss Aff. ¶ 3; Mackiewicz Aff. ¶¶ 3–4.) However, neither novelty nor "substantial" originality are the tests for copyrightability. *See Feist*, 499 U.S. at 345, 111 S.Ct. at 1287 ("[o]riginality does not signify novelty"). The works need only possesses some minimal degree of creativity. *See Feist*, 499 U.S. at 345, 111 S.Ct. at 1287. While Lindner's works may not be as creative as a portrait by Dianne Arbus, they show artistic judgment and therefore meet the *Feist* standard. That the photographs were intended solely for commercial use has no bearing on their protectibility. *See Bleistein*, 188 U.S. at 251–52, 23 S.Ct. at 300.

Defendants also seek to minimize plaintiff's creativity by describing the photographs as "accurate and precise copies of framed mirrors." Thus, they assert that the frames were "merely photographed one after another, all in the same straightforward manner faithfully to copy them to the medium of film." (Munn Aff. ¶¶ 7, 9.) The "master" photographs of the frames offered as an exhibit to defendants' expert's affidavit, present a compelling visual case that undermines defendants' arguments. (Oudit Harbhajan Aff. Ex. A.) The "master" photographs have none of the aesthetic elements that make plaintiff's photographs attractive. The gilded frames are dull and the details are obscured by shadows or overexposed.

There is no legal significance to defendants' argument that Lindner merely photographed one frame after another. Without contradiction, Lindner states that "[e]ach frame required a different treatment." (Lindner Aff. ¶ 4.) Contrary to defendants' assertion, there is no requisite amount of time necessary to create a copyrighted work; originality is the only requirement. As Circuit Judge Easterbrook observed:

> The copyright laws protect the work, not the amount of effort expended. A person who produces a short new work or makes a small improvement in a few hours gets a copyright for that contribution fully as effective as that on a novel written as a life's work. Perhaps the smaller the effort the smaller the contribution; if so, the copyright simply bestows fewer rights. Others can expend the same effort to the same end. Copyright covers, after all, only the incremental contribution and not the underlying information.
>
> The input is irrelevant. *A photograph may be copyrighted, although it is the work of an instant and its significance may be accidental.* In 14 hours Mozart could write a piano concerto, J.S. Bach a cantata, or Dickens a week's installment of Bleak House. The Laffer Curve, an economic graph prominent in political debates, appeared on the back of a napkin after dinner, the work of a minute. All of these are copyrightable.

*Rockford Map Publishers, Inc. v. Directory Serv. Co.*, 768 F.2d 145, 148 (7th Cir. 1985) (citations omitted).

While plaintiff's photographs meet the minimal originality requirements in *Feist*, they are not entitled to broad copyright protection. Plaintiff cannot prevent others from photographing the same frames, or using the same lighting techniques and blue sky reflection in the mirrors. What makes plaintiff's photographs original is the totality of the precise lighting selection, angle of the camera, lens and filter selection. In sum, plaintiff is granted copyright protection only for its "incremental contribution." *Rockford Map Publishers*, 768 F.2d at 148. Practically, the plaintiff's works are only protected from verbatim copying. However, that is precisely what defendants did.

## V. *Work–for–Hire*

Defendants claim that even if the photographs are protectible, they were created for Interiors as works-for-hire. If this defense is proven, plaintiff's infringement claim fails because as authors, defendants would own all copyrights in the photographs. *See* 17 U.S.C. §§ 101 (definition

of "work made for hire") [4] and 201(b) ("[i]n the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author").

There are two categories of work-for-hire: (1) works created by employees; and (2) works created by independent contractors under special order or commission. *See* 17 U.S.C. § 101. Although defendants have not specified which categories they claim, only the first is relevant in this case. The second category is inapplicable because photographs are not included in the § 101 list of subject matters permitting a work-for-hire agreement with independent contractors. Even if these photographs could be shoehorned into a § 101 subject matter category, they will still not qualify as a work-for-hire because there was no written agreement between the parties.

Thus, the only relevant question is whether defendants were plaintiff's "employers" under the Copyright Act. Faced with congressional silence concerning the term "employer," the Supreme Court created a federal common law agency test to evaluate work-for-hire claims. *See Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 750–751, 109 S.Ct. 2166, 2178, 104 L.Ed.2d 811 (1989); *see also* Patry at 377 ("[W]hile the Court referred to the Restatement of Agency for factors lower courts should apply in determining whether an individual is an independent contractor or an employee, [*Reid*] adopted a federal rule of agency patterned on the common law.").

The *Reid* Court identified thirteen factors to consider in determining whether a party is an employer under agency principles:

> the hiring party's right to control the manner and means by which the product is accomplished . . . [;] the skill required; the source of the instrumentalities and tools; the location of the work; the du-

ration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

490 U.S. at 751–752, 109 S.Ct. at 2178–79 (footnotes omitted). None of these is dispositive; in fact they are not even the universe of factors that can be considered. *Reid,* 490 U.S. at 752, 109 S.Ct. at 2179. Rather, it is the totality of the parties' relationship that is the focus of the inquiry.

The Second Circuit has construed *Reid* several times. *See Langman Fabrics,* 160 F.3d at 110–113; *Graham v. James,* 144 F.3d 229, 234–35 (2d Cir.1998); *Carter v. Helmsley–Spear, Inc.,* 71 F.3d 77, 85–88 (2d Cir.1995); *Playboy Enters., Inc. v. Dumas,* 53 F.3d 549 (2d Cir.1995); *Aymes v. Bonelli,* 980 F.2d 857, 860–64 (2d Cir. 1992). The *Aymes* court's analysis of work-for-hire is the most extensive. There, the Second Circuit declined to treat all thirteen of the *Reid* factors as equally important or even relevant in every case. *See* 980 F.2d at 861. Instead of woodenly tallying the factors, the *Aymes* court emphasized that each factor is to be weighed according to the significance it played in the work's creation. *See* 980 F.2d at 861. Nonetheless, the *Aymes* court identified five of the *Reid* factors that are significant "in virtually every situation." These five are:

> (1) the hiring party's right to control the manner and means of creation; (2) the skill required; (3) the provision of em-

---

4. Although the statutory term is "work made for hire," it is common to shorten it to "work-for-hire," a practice adopted here.

ployee benefits; (4) the tax treatment of the hired party; and (5) whether the hiring party has the right to assign additional projects to the hired party.

*Aymes,* 980 F.2d at 861. *Accord, e.g., Langman Fabrics,* 160 F.3d at 111; *Carter,* 71 F.3d at 86; *cf. Graham,* 144 F.3d at 235 ("[w]e give greater weight to certain of the *Reid* factors"). The *Aymes* court indicated that these five factors should be given more weight "because they will usually be highly probative of the true nature of the employment relationship." 980 F.2d at 861.

## A. The Hiring Party's Right to Control the Manner and Means of Creation

The first factor identified by the *Reid* Court—a general right of control—can be indicative of both a work-for-hire employee and an independent contractor. *See, e.g.,* Patry 1998 Supp. at 59. Thus, in order to determine whether the hired party is an employee rather than an independent contractor, there must be evidence that the hiring party actually contributed to the aesthetic choices.

Defendants do not claim that they instructed plaintiff to use any particular camera, film or equipment. Munn only reviewed Polaroid photographs of the works in progress to ensure plaintiff was achieving the ultimate result that Munn desired. (*See* Munn Reply Aff. ¶ 12.) Munn's passive review is a far cry from the assertions in *Langman Fabrics* that the hiring party literally stood over the hired party giving her instructions in "laborious detail" concerning exactly how to create the work. *Langman Fabrics,* 160 F.3d at 111–112. Indeed, it is uncontradicted that Munn remained closeted in his office throughout the shoot. (Lindner Aff. ¶ 13.) As in *Graham,* Munn's involvement in the creation of the photographs "was minimal and ... his instructions ... were very general." *Graham,* 144 F.3d at 235; *accord Marco v. Accent Publ'g Co.,* 969 F.2d 1547, 1551–52 (3d Cir.1992) (photographer is not work-for-hire employee where hiring party "controlled only the subject matter and composition of the images" but not "most aspects of the work, including the choice of light sources, filters, lenses, camera, film, perspective, aperture setting, shutter speed, and processing techniques").

## B. The Skill Required

Lindner had twenty-five years experience as a professional photographer when defendants hired him and defendants "do not question [plaintiff's] application of technical skill, which was the reason he was hired." (Defs.' Br. at 3; Munn Reply Aff. ¶ 8.) The record is bereft of any evidence that defendants possessed any technical photographic skills. *See Marco,* 969 F.2d at 1551 (noting that defendant although himself an art director had hired a' professional photographer because the photographer is "the person who makes the shot work," and describing the photographer as "certainly skilled in the sense that Reid, the sculptor in the *Reid* case, was skilled"); *cf. Morita v. Omni Publications, Int'l, Ltd.,* 741 F.Supp. 1107 (S.D.N.Y.1990) (photographer is not merely a "mechanical" extension of hiring party).

## C. The Provision of Employee Benefits

There is no claim in this case that defendants provided plaintiff with any employment benefits. *Cf. Carter,* 71 F.3d at 86 (artists given paid vacations and other benefits such as unemployment, life, health, and liability insurance, as well as worker's compensation).

## D. The Tax Treatment of the Hired Party

Defendants do not claim that they withheld any taxes or made any tax payments on behalf of plaintiff. *Cf. Carter,* 71 F.3d at 86 (artists had income and social security taxes deducted from their weekly salary).

### E. The Hiring Party's Right to Assign Additional Projects to the Hired Party

There is no claim in this case that the defendants had the right to assign, or in fact assigned additional projects to plaintiff after all the mirrors were photographed. *Cf. Carter,* 71 F.3d at 86 (hiring party had and exercised the right to assign artists to other projects without further compensation).

### F. The Other Eight Reid Factors

Although the *Aymes* court did not require that every work-for-hire factor be analyzed, that holding should not be construed as precluding district courts from continuing the inquiry under the remaining eight *Reid* factors. Similarly, it need not necessarily follow that the five factors identified in *Aymes* will invariably be the most significant. Indeed, some of the other eight *Reid* factors are helpful in analyzing this case.

The source of the instrumentalities and tools factor is significant because the choice of equipment played a vital role that affected the aesthetic appearance of the photographs. (*See* Lindner Aff. ¶ 17.) The duration of the relationship between the parties also informs the analysis. In contrast to a typical employee, plaintiff was hired by defendants for the specific photo shoot in question. Defendants did not exercise any control over when and how long plaintiff would work. So too, defendants neither hired nor paid any of Lindner's assistants. It is noteworthy that defendants are in the business of creating and selling frames, while plaintiff's sole business is creating photographic works. Defendants have never suggested that they regularly photographed their own catalogues.

### G. Work–For–Hire Conclusions

In sum, the *Reid* factors weigh heavily in plaintiff's favor. Defendants' argument that plaintiff was a work-for-hire employee because "SHL Imaging was given explicit instructions and worked under the supervision of the defendants, at their premises, photographing their property [and] ... paid SHL Imaging's expenses" is unavailing.[5] (Defs.' Br. at 17.) Resolving all ambiguities and drawing all permissible factual inferences in favor of defendants, it is clear that defendants' instructions were so general as to fall within the realm of unprotectible ideas. Thus, they cannot substantiate a work-for-hire authorship defense. If inevitable, routine participation sufficed to transform the hiring party into a work-for-hire author, *Reid* would be eviscerated and the law would retrogress to the "actual supervision and control" rule established in *Aldon Accessories, Ltd. v. Spiegel, Inc.,* 738 F.2d 548 (2d Cir.1984).

### VI. Joint Authorship

■ Defendants also move for summary judgment on the grounds that the photographs are joint works. Since one joint author may not sue another joint author for copyright infringement, if the works are joint works, plaintiff's infringement claim must fail. *See, e.g., Weissmann v. Freeman,* 868 F.2d 1313, 1318 (2d Cir. 1989) ("[A]n action for infringement between joint owners will not lie because an individual cannot infringe his own copyright. The only duty joint owners have with respect to their joint work is to account for profits from its use."). Like work-for-hire, joint authorship is an affirmative defense. Plaintiff's certificate of registration indicating SHL is the author is prima facie evidence of sole authorship. *See* 17 U.S.C. § 410(c)(1978). Defendants bear the burden of overcoming this statutory presumption. *See, e.g., Langman Fabrics,* 160 F.3d at 111.

---

5. This assertion is the totality of defendants' work-for-hire argument. The only case cited in support of their argument is a 1988 district court case which was effectively overruled by *Reid.*

The starting point for any claim of joint authorship is the definition of "joint work" in the copyright statute. *See, e.g., Childress v. Taylor,* 945 F.2d 500, 505 (2d Cir.1991). 17 U.S.C. § 101 states: "A 'joint work' is a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." The leading case construing this definition is *Childress v. Taylor,* 945 F.2d 500 (2d Cir.1991). In *Childress,* defendant asserted joint authorship of a play, despite the fact that she had not contributed copyrightable expression. The defendant claimed that one could be a joint author in the absence of such a contribution so long as the work as a whole was original. The Second Circuit rejected that argument and held that joint authors must contribute expression. *See Childress,* 945 F.2d at 507. The *Childress* court required that all joint authors contribute expression to "prevent some spurious claims by those who might otherwise try to share the fruits of the efforts of a sole author of a work . . . ." 945 F.2d at 507.

Defendants assert that they are joint authors by reason of their creation of the frames. Their argument continues that the framed mirrors "constitute . . . 'inseparable or interdependent parts . . .' of the photographs." (Defs.' Br. at 15.) However, the copyrighted works at issue are the photographs, not the frames. If defendants' theory were credited, then any photograph of any copyrighted sculptural work would automatically be a joint work between the photographer and the sculptor. Such a result would be plainly absurd.

In their supplemental submissions, defendants assert that their selection of the frames and their "right to control" the photographs after they were developed[6] creates an issue of fact about the parties' intent to be joint authors.[7] (Defs.' Supp. Br. at 8.) It is no surprise that defendants selected the frames to be photographed since that is why they hired SHL in the first place. Mere selection of the subject matter to be photographed does not create joint authorship. Similarly, ownership of the physical embodiment of a work does not bear on ownership of the intellectual property in that work. The Copyright Act differentiates between ownership of the physical embodiment of a work and ownership of the intellectual property in a work:

> Ownership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied. Transfer of ownership of any material object does not of itself convey any rights in the copyrighted work embodied in the object. . . .

17 U.S.C. § 202.

To be a "joint work" under the Copyright Act, the authors must have "the intention that their contributions be merged." 17 U.S.C. § 101 (1978). The requisite intent is "especially important in circumstances, [such as this case], where one person . . . is undisputably the dominant author of the work and the only issue is whether that person is the sole author or she and another . . . are joint authors." *Childress,* 945 F.2d at 508; *see also Thom-*

---

**6.** Defendants also state in their supplemental August 11, 2000 brief that plaintiff gave them the negatives. (Defs.' Supp. Br. at 8.) Defendants do not cite to any sworn statement in support of this allegation. *See* Fed.R.Civ.P. 56(e); *Skyline Corp. v. NLRB,* 613 F.2d 1328, 1337 (5th Cir.1980) ("Statements by counsel in briefs are not evidence."); *Markowitz Jewelry Co. v. Chapal/Zenray, Inc.,* 988 F.Supp. 404, 407 & n. 18 (S.D.N.Y.1997) (same). In any event, transfer of the physical embodi-

ment of a work is not evidence of joint authorship.

**7.** The Court notes that defendants advance only three arguments regarding joint ownership: authorship of the frames, selection of the frames and "right to control" the photographs. Since defendants have had what is tantamount to three separate opportunities to move for summary judgment, these are the only arguments that this Court will consider.

*son v. Larson,* 147 F.3d 195, 201–02 (2d Cir.1998).

The relevant inquiry in determining the parties' intent to be joint authors is whether they "entertain[ed] in their minds the concept of joint authorship, whether or not they understood precisely the legal consequences of their relationship." *Childress,* 945 F.2d at 508. Although "joint authorship does not require an understanding by the co-authors of the legal consequences of their relationship, ... some distinguishing characteristic of the relationship must be understood for it to be the subject of their intent." *Childress,* 945 F.2d at 508. In *Childress,* the Second Circuit observed that where there is no contractual agreement concerning authorship, it is useful to look for an understanding about authorship credit. *See* 945 F.2d at 508; *see also Thomson,* 147 F.3d at 202–204 (discussing contributor's decision-making authority over what changes are made in the work and whether parties believed they could enter into agreements with "outsiders" concerning use of the work).

Here, defendants have not offered any evidence that they intended to share credit for the photographs. Indeed, they possess none of the indicia of copyright ownership such as registering the photographs at the time they were created, or affixing a copyright notice on the work.

Accordingly, defendants are not joint authors.

## VII. *Transfer of Rights*

Finally, defendants assert that Lindner agreed that Artisan would have the right to use the photographs without limitation. Defendants bear the burden of proving the existence of a license covering the activity in question. *See, e.g., Graham,* 144 F.3d at 236 (citing *Bourne v. Walt Disney Co.,* 68 F.3d 621, 631 (2d Cir.1995)).

The Copyright Act prescribes a comprehensive scheme for the licensing of copyrighted works. *See, e.g.,* 17 U.S.C. §§ 101, 201(d), 204, 205 (defining "copyright owner" and "transfer of copyright ownership"). There are three possible types of licenses: (1) written; (2) oral; (3) implied. *See* Patry at 390. A written license may be either exclusive or non-exclusive. An oral license and an implied license can only be non-exclusive. *See* 17 U.S.C. § 204(a) ("A transfer of copyright ownership, otherwise than by operation of law, is not valid unless an instrument of conveyance ... is in writing and signed by the owner of the rights conveyed.").

### A. *Express License*

■ Defendants assert that the "intrinsic evidence before the Court on the terms and scope of the parties['] license is contradictory" and therefore summary judgment should be denied. (Defs.' Supp. Br. at 4.) Defendants observe that the initial estimate Lindner provided to Munn simply provides prices for "3 days," "film & processing" and "no seam paper." (Munn Aff. ¶ 6 & Ex. B.) Thus, they maintain it does not limit the use of the photographs. A subsequent estimate limited the use of the prints to "(C–Prints) for retail point of purchase." [8] (Defs.' Supp. Br. Appendix 3.) The final invoice, which was initialed by Munn, states: "Usage: For C–Prints to be used by sales people." (Lindner Aff. Ex. 1.) Therefore, defendants contend that the parties' license is unclear.

Defendants' argument is without merit. Irrespective of any ambiguity in the estimate or invoices, those documents do not purport to transfer ownership or non-exclusive use of the copyrights in the photographs. None of them even allude to the transfer of exclusive or non-exclusive copyrights. Rather, they simply memorialize the parties' bargain with respect to the transfer of the physical prints and the

---

**8.** This estimate was submitted as an appendix to defendants' supplemental brief. Since it is not attached to any sworn document, the Court does not rely on it. However, even if it was properly submitted, it would not effect this Court's analysis.

price for plaintiff's services. The documents therefore fail to comply with the § 204(a) requirements.

## B. *Implied License*

■ Alternatively, defendants argue that they had an implied license to use the photographs in a catalogue. (Defs.' Br. at 8; Defs' Reply Br. at 14–15; Defs' Supp. Br. at 4.) However, given the extensive reproduction of the photographs in various media, the implied license would have to be broader than limited use in a catalogue.

Recently, the Second Circuit cautioned that implied licenses will be found "only in 'narrow' circumstances where one party 'created a work at the [other's] request and handed it over, intending that [the other] copy and distribute it.'" *Smith-Kline Beecham Consumer Healthcare, L.P. v. Watson Pharms., Inc.*, 211 F.3d 21, 25 (2d Cir.2000). An implied license can only exist where an author creates a copyrighted work with knowledge and intent that the work would be used by another for a specific purpose. Thus, in *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558 (9th Cir.1990), the copyright owner created special effects for a horror movie. Following a monetary disagreement and distribution of the movie, the copyright owner sued for infringement. Relying on the parties' course of dealing and the copyright owner's registration which stated that the special effects footage was to be used in the movie, the Ninth Circuit found an implied license. Thus, defendants had the right to use the special effects in the manner intended by plaintiff, *i.e.*, in the movie. *See* 908 F.2d at 559 & n. 6.

Courts have also found implied licenses where jingles or songs were created for use by a specific radio station or a sports team and were used in exactly the manner intended by the copyright owner over a lengthy period. In those cases, the passage of time afforded the copyright owner ample opportunity to terminate the implied license. *See Korman v. HBC Florida*, 182 F.3d 1291, 1293 (11th Cir.1999); *Jacob Maxwell, Inc. v. Veeck*, 110 F.3d 749, 751–752 (11th Cir.1997).[9]

However, no court has found an implied license where the nature of the use is contested. The absence of an implied license to reproduce the photographs for catalogues and computer generated images does not render the C-prints useless; they are useful as sales tools without implying a license.

Further, there is no evidence of a meeting of the minds between plaintiff and defendants. Defendants do not maintain that Lindner created the C–Prints with the intention that defendants use them in any manner they wished. Nor do defendants suggest that plaintiff knew or intended that the prints be scanned in a computer or used for "magazine comps." Rather, defendants merely allege that Lindner suspected defendants *might* use the photographs for a catalogue. (*See* Ferron Dep. at 55–56.) This is not sufficient evidence to establish an implied license. As Judge Sweet observed, "an implied license to use a copyrighted work 'cannot arise out of the unilateral expectations of one party.' There must be objective conduct that would permit a reasonable person to conclude that 'an agreement had been reached.'" *Design Options, Inc. v. BellePointe, Inc.*, 940 F.Supp. 86, 92 (S.D.N.Y.1996) (quoting *Allen–Myland v. International Bus. Mach. Corp.*, 746 F.Supp. 520, 549 (E.D.Pa.1990)). *See also N.A.D.A. Servs. Corp. v. Business Data of Virginia, Inc.*, 651 F.Supp. 44, 49 (E.D.Va. 1986) ("The creation of an implied license, as in the creation of any implied contract, requires a meeting of the minds"). Here, the record shows only that plaintiff created the photographs, sold them to defendants

---

9. In the cited cases, the Eleventh Circuit appears to regard implied licenses as an equitable device, akin to equitable estoppel. This view has been rejected by the Ninth Circuit, *see Effects Assocs.*, 908 F.2d at 559 n. 7, which regards them as a variety of a legal, implied-in-fact contract.

**318**

for a price, and never conveyed any rights to reproduce the photographs directly or by implication. Accordingly, a license will not be implied. *See, e.g., Design Options,* 940 F.Supp. at 92 (no implied license where plaintiff sold sweater to defendant for resale and there was no evidence that there was anything more to the transaction than the purchase of goods for an agreed-upon price).

In summary, the undisputed evidence shows that the photographs are entitled to copyright protection; that plaintiff is the sole owner of the copyrights in those photographs; and defendants copied the photographs verbatim without the authority of the copyright owner. Accordingly, defendants are liable for infringing plaintiff's copyrights.

*CONCLUSION*

Defendants' motion for summary judgment is denied in its entirety. Partial summary judgment is hereby granted to plaintiff on the issue of copyright liability. A pretrial conference will be held on October 18, 2000 at 5:00 p.m.

SO ORDERED: